STANDARD SLAG CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19028.   Promulgated August 7, 1930.

*John T. Kennedy, Esq.*, and *Blaine Mallan, Esq.*, for the petitioner.

*James L. Backstrom, Esq.*, and *P. A. Sebastian, Esq.*, for the respondent.

506

508

OPINION.

MARQUETTE: The first issue raised herein is as to the amount that should be included in the petitioner's invested capital for the years 1919, 1920, and 1921 on account of the Penn Iron & Coal Co., United Iron & Steel Co., Shenango Furnace Co., Marting Iron & Steel Co., and the Jackson Iron & Steel Co. contracts set forth in the findings of fact. The respondent has adopted a value of $17,540 for the first two contracts and has computed the allowance for exhaustion on that basis, but has refused to allow any amount for the three other contracts either for invested capital or as a basis for computing allowances for exhaustion.

The petitioner contends that the contracts with the Penn Iron & Coal Co. and the United Iron & Steel Co., had a total fair market value of $137,500 at the time it acquired them, and that the Marting Iron & Steel Co., the Shenango Furnace Co., and the Jackson Iron & Steel Co. contracts had a fair market value of at least $311,000 when they were assigned to the petitioner. The petitioner further claims that the depreciated values of the five contracts were $313,600 for 1919, $268,800 for 1920, and $224,000 for 1921, which should be included in invested capital for those years.

The petitioner has presented no direct evidence respecting the fair market value of any of the contracts in question, but the alleged values are reached by a series of intricate and complicated calculations, which can be best stated by quoting from the petitioner's brief:

1. *The contracts had a value of at least $448,000 when assigned to the petitioner.*

The discussion of the value of these contracts will be offered in four steps, which are:

(a) A sale of one-fourth of the capital stock of the France Slag Company, about one year prior to the assignment, shows that two of these five contracts, by themselves, had a value of about $137,500.

(b) This value, according to Departmental rules of calculation, would be based on a premium of 11.9 cents a ton over the royalty provided in the contracts.

(c) Applying a like differential to the production of the five contracts, without considering the production from other plants over which they gave control, results in a value of $459,119.27.

(d) Taking into consideration the entire production over which these contracts gave the petitioner control, and applying a five cents per ton premium, results in a value of $448,968.86.

About the beginning of 1915 one-fourth of the capital stock of the France Slag Company was sold for $100,000. At that time the entire capital stock and surplus of the France Slag Company was $125,000. The contracts were not carried on the books of that company at any value. The company owned no land, and hence the excess of this price over book value was not reflected in an

increase in land values. Nor was such excess reflected in any secret or hidden reserves. The only source of income of the France Slag Company was from four contracts, of which two were assigned to the petitioner.

Mr. Beeghley and his associates owned fifty per cent of the capital stock of the France Slag Company. When they left that company they received in distribution about one-half of the assets, exclusive of the contracts, and two of the four contracts of that company. Consequently, the value of the two contracts received by Mr. Beeghley and his associates was one-half of the value of the four contracts owned by the France Slag Co.

The following calculations are based on the foregoing facts:

Selling price—¼ capital stock France Slag Co._____ $100,000

Total market value capital stock France Slag Co._____ 400,000
Book value capital stock France Slag Co. exclusive of contracts_____ 125,000

Market value of the four contracts_____ 275,000

Inasmuch as the distribution of assets was based upon the Penn and United contracts having a like value to the two contracts retained by the France Slag Company, it follows that the value of the two contracts assigned by these individuals to the petitioner was at least $137,500.

The sale of this stock at a price which would give a value of $137,500 for the two contracts is equivalent to the payment of 11.9 cents a ton premium, as next explained.

The average annual output of these two contracts, together, was 150,000 tons. They were for a term of ten years with a renewal clause for an additional ten years, and of this twenty-year period about five years had elapsed at the time of the sale. Accordingly, these calculations will be based on an unexpired fifteen-year term. Hoskold's Formula for a present worth on a fifteen-year term basis at eight per cent and four per cent, is 0.513053.

The sale value of the contracts, as above given, was $137,500, which sum divided by 0.513053 gives $268,003.50 as the gross value of the fifteen annuities. This amount divided by fifteen, gives the value of the annuity as $17,866.90. The latter amount, $17,866.90, divided by the annual production, 150,000 tons, gives a per ton premium of 11.9 cents.

Based then on the customary methods of calculation approved by the Treasury Department, the foregoing sale of stock is equivalent to the payment of a premium of 11.9 cents a ton on the production of these contracts.

The other three contracts assigned to the petitioner were on substantially the same basis as these two contracts. Production under the five contracts was as follows:

|  | Average annual output (tons) |
|---|---|
| Penn Iron & Coal Co._____ | 75,000 |
| United Iron and Steel Co._____ | 75,000 |
| Shenango Furnace Co._____ | 200,000 |
| Marting Iron & Steel Co._____ | 200,000 |
| Jackson Iron & Steel Co._____ | 80,000 |
|  | 630,000 |

Applying the same premium per ton that was determined from the sale of one-fourth of the capital stock of the France Slag Company, the following value is shown:

Annual production of the five contracts_____tons__  630,000
Above tonnage multiplied by 11.9 cents gives annuity of_____  $74,970.00
Multiply by effective control period of contracts (10 years)_____  $749,700.00
To get present worth by Hoskold's Formula 8 and 4 per cent, mul-
    tiply by 0.612404_____  $459,119.28

Another method of determining the value of these five contracts is based on the control they gave over the slag output in this district. The testimony is clear that because these five contracts gave the petitioner substantially all of the storage facilities in this district, the petitioner was able to obtain other contracts and to control eighty-five per cent of the slag output. The result was that the petitioner obtained control over 1,430,000 tons annual output.

In determining the value on this basis we shall confine ourselves exclusively to the lower royalty rate which this control obtained, and shall not consider that it also enabled the company to obtain, upon sale, a price of ten or fifteen cents more than was obtained in any other district. This difference in royalty rate, supported by the testimony of three witnesses, and substantiated by the renewal rate specified in the Marting contract, was five cents a ton.

The calculation on this basis follows:

Annual output controlled_____tons__  1,430,000
Multiply above amount by 5¢ a ton gives annuity of_____  $71,500.00
Multiply by effective control period of contracts (10 years)_____  $715,000.00
To get present worth by Hoskold's Formula, 8 and 4 per cent,
    multiply by 0.612404_____  $448,968.86

Of the values above shown, we propose the last, which shows the lowest amount, that is, $448,000.00.

We respectfully submit that the facts above outlined clearly show that two of these five contracts, by themselves, had a value of about $137,500 and that the value of the five contracts, computed by accredited methods of income tax practice, was at least $448,000.00 when assigned to the corporation.

*Invested capital should include the value of these contracts depreciated to the beginning of each taxable year.*

The years before the Board are 1919, 1920 and 1921. The 1916 value was $448,000 depreciated to the beginning of each of these years, using a ten per cent depreciation rate, would give the following amounts to be included in invested capital:

1919 _____  $313,600.00
1920_____  $268,800.00
1921_____  $224,000.00

We are of the opinion that the petitioner has wholly failed to establish for the contracts in question the value it claims. The contracts were for the purchase of raw material, which the petitioner intended to prepare for commercial use and sell. We are not advised what markets, if any, the petitioner had for its product in 1915 and 1916, nor whether the demand for that product was large or small, steady or fluctuating, increasing or decreasing. The petitioner received 70 cents per ton for its crushed slag in 1915, and received $1 per ton in 1916. But the evidence does not disclose the cost of preparing and marketing the product, nor whether it could be sold in paying

quantities, nor whether any profit was realized by virtue of these contracts in question. The only proven fact upon which the petitioner bases its contention is that early in 1915, $100,000 was paid by one member of the France family to another member in exchange for 25 per cent of the France Co.'s stock. We are not convinced that such a sale, without other corroborating evidence, fixes the fair market value of all that company's stock at $400,000 as claimed. And even if the stock did have that value, it does not follow that the four slag purchase contracts then owned by the France Company equaled one another in value. We are told that that company had no source of income other than that derived under its four contracts. But how much of that income, if any, was attributable to the two contracts later acquired by the petitioner, we are not told. The record establishes a theoretical, but not an actual market value for the contracts in question.

From its inception the petitioner has carried on its books the Penn and the United contracts at a total valuation of $17,540, which has been allowed by the respondent as invested capital. In our opinion the evidence does not warrant any further allowance for paid-in surplus with respect to the four contracts in question.

The second contention is that the petitioner should be allowed annual exhaustion in the amount of $44,800 upon the five contracts which we have just discussed. As the contention is based upon the petitioner's alleged values of those contracts, which values we have found were not sustained by the record, it follows that this claim for annual exhaustion of those contracts must be denied.

The next error alleged is that the respondent has included the amount of $90,471.65 as income to the petitioner for the year 1921. This amount represents the net proceeds derived during that year from a contract with the Republic Iron & Steel Co. It is contended that the amount is not taxable income because, under the terms of the contract, the petitioner had agreed that any surplus proceeds would not be treated as profit, but would be used by the petitioner in research and experimental work. These researches and experiments, if favorable in their outcome, ultimately would benefit the Republic Co. as well as the petitioner. No part of the amount in question was expended during 1921, but during subsequent years it was expended in research and experimental work.

Section 213 of the Revenue Act of 1921 provides:

SEC. 213. That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal services * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales,

or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividend, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. \* \* \*

It is clear that under the above statute property is impressed with the character of income according to the manner in which it is acquired. Whether any such acquisition does or does not become income is not determined by the use to which the recipient may devote the property, nor by his agreement that he will or will not treat it as profit. Here, the amount in question was derived from the operation of a business contract, in the due course of business. It comes within the scope of the rule stated by the Supreme Court in *Eisner* v. *Macomber*, 252 U. S. 189: " Income may be defined as the gain derived from capital, from labor, or from both combined." See also *Stratton's Independence* v. *Howbert*, 231 U. S. 399, and *Doyle* v. *Mitchell*, 247 U. S. 179.

The petitioner has cited a number of decisions by this Board, and also *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 628, in support of its contention that the amount in question was not income. In each of those cases contributions given to aid the taxpayer in establishing a factory, or in extending the service of a public utility, were held not to be income to the taxpayer. We do not question the correctness of those decisions but as they are founded on facts materially different from those now before us, we can not accept them as guiding authorities in this instance. In our opinion the respondent correctly included the amount received under the Republic Co.'s contract as taxable income to the petitioner for 1921.

The last issue for our consideration is whether the petitioner is entitled to special assessment for the years 1919, 1920, and 1921. The petitioner bases its contention upon the following allegations of abnormality:

(*a*) Inability to satisfactorily determine invested capital.

(*b*) Abnormality of income arising from inability to determine exhaustion of contracts.

(*c*) Abnormality of income due to development work in prior years.

(*d*) That assets employed to produce income were not owned by the petitioner but were placed at its disposal for a nominal rental.

The provisions of section 327 of the Revenue Acts of 1918 and 1921 are identical. In so far as material here they are:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;

\* \* \* \* \* \* \*

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock, or for stock and bonds and the Commissioner is

unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply in any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital * * *.

Section 328 provides for a special manner of assessing income tax in the cases specified in section 327.

With respect to issues (a) and (b) we are of opinion that no abnormality exists. A determination that certain contracts have no value for invested capital purposes and, therefore, none for exhaustion purposes, does not bring about such an abnormality as is contemplated by the statute providing for special assessment. See *Figueroa Street Hotel Co.*, 18 B. T. A. 709; *West Virginia Malleable Iron Co.*, 17 B. T. A. 1120; *Coca-Cola Bottling Works of Pittsburgh*, 19 B. T. A. 267.

In the decision last cited we find a condition very similar to the one now before us. There, the taxpayer had a contract giving it the exclusive rights to bottle and sell Coca-Cola within a specified territory, and it derived large profits from the business. The Commissioner did not allow any value for the contract for invested capital purposes. The taxpayer claimed special assessment on the ground that its profits were largely attributable to conditions not reflected in its invested capital, namely, the ownership of a valuable contract which was its chief income-producing factor. The taxpayer argued that its contract had a value of $400,000 and, since that value was not recognized for invested capital purposes, an abnormality existed. In refusing the claim for special assessment, it was said:

Obviously, * * * the petitioner could not operate without the contract, but this does not necessarily make of the contract an income-producing asset. The same might be said of many sales or distribution contracts, * * * but the contract itself does not usually produce income; it is the operations under the contract which give rise to income. * * *

But we do not think it necessarily follows that an abnormality exists as contemplated by the statute because a corporation has an asset which is of value * * * but which may not be included in invested capital. * * * The statute specifically provides that the special assessment provisions " shall not apply in any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable years a high rate of profit upon a normal invested capital." * * * Abnor-

mality means at least a deviation from a normal condition. What this petitioner had in the form of an unrecognized asset (for invested capital purposes) would not seem to be other than what is normally found in concerns of a similar character.

The language just quoted is, we think, very applicable to the present proceeding. In *Coca-Cola Bottling Works of Pittsburgh*, *supra*, the petitioner enjoyed a monopoly by virtue of its contract; in the case under consideration the petitioner's contracts eliminated 80 to 85 per cent of the possible competition. In both cases the contracts were highly essential to the successful outcome of the business enterprises, but the profits realized were due to factors outside the contracts, such as management, methods pursued, business zeal, working capital, etc. In each case the petitioner had invested capital which was determinable under section 326 of the Revenue Acts, and which was determined and credit therefor given to the. taxpayer. In our opinion there is no ground in the present proceeding for granting special assessment under the petitioner's issues (*a*) and (*b*).

In issue (*c*) abnormality of income is claimed because of development work in prior years. Presumably the petitioner had reference to the development of markets for crushed slag, and of the use of the small pit system of treating slag at the iron furnaces. We are not advised as to the nature or amount of any expenditures made to further such development, nor whether any such expenditures were charged to capital or to operating expense, nor whether petitioner's records are in such condition that any erroneous bookkeeping entries may be rectified. Clearly, the mere expenditure of money to obtain new and wider markets for one's product, or to extend the use of a favorable method of production, does not prove the existence of an abnormality. In the present instance the development of the small pit system was not accomplished through any patent or secret process. It was open to the world, free to any who might wish to use it. The record does not show that any definite amount of the petitioner's income was due to this system. In our opinion, no abnormality has been shown under issue (*c*). See *Cohn-Goldwater Co.*, 15 B. T. A. 970; *Railroad Supply Co.*, 15 B. T. A. 1204.

The final allegation of abnormality is that the petitioner's income was produced by the use of assets owned by others, for which petitioner paid only a nominal rental. There is no evidence before us to indicate what would be a fair and proper rental for the facilities so used by the petitioner; but, assuming that the amount paid was greatly below the real value of the facilities, we are not convinced that an abnormality existed within the meaning of the statute.

516

This Board has held that highly favorable contracts alone do⁴ not constitute abnormalities calling for special ·assessment. See *Mutual Oil Co. of Arizona*, 14 B. T. A. 538; *Moses-Rosenthal Co.*, 17 B. T. A. 622.

*Judgment will be entered for the respondent.*