GARDEN HOMES COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42635, 46035. Promulgated June 15, 1932.

*Maxwell H. Herriott, Esq.*, and *Leo Mann, Esq.*, for the petitioner.
*M. M. Mahany, Esq.*, for the respondent.

# 450

OPINION.

McMahon: The petitioner contends that for the years 1923 to 1927, both inclusive, it had no income whatever subject to income and profits taxes; that payments by common stockholders were erroneously entered on the books of account in accounts which are normally income accounts; and that the taxable income for the years involved, as shown in the deficiency notices, was determined by including therein the items erroneously entered on the books of account as income.

The petitioner represents that it manufactured no product and sold no commodity other than its stock, common and preferred, and distributed only its capital assets in lieu of common stock; that its sole object was to provide homes for Milwaukee working men who, to be privileged to occupy the homes constructed by the petitioner, had to subscribe for the common stock of the petitioner equal in par value to the cost of the lot and the house to be occupied, together with an estimated amount for carrying charges; that later it was realized that not only was an expansion of the project impossible from a business standpoint, but that it was not feasible to attempt to carry on even the 105 homes pursuant to the law cooperative plan under which they were constructed; that a law (chapter 321 of the Wisconsin Laws of 1925) was passed to permit the petitioner to give deeds to the occupants of the homes upon payment of their stock in full, or to exchange land contracts for the outstanding stock, giving the occupant as credit on the land contract the amount of his equity on his stock; that some of the subscribers went to building and loan associations to raise sufficient money to pay for their stock in full

and acquire deeds from the petitioner, and others exchanged their stock for land contracts, the unpaid portion of the stock subscriptions constituting the unpaid amount due on the land contract; and that the assignment attached to pass book covering lot 4 in block 9 is typical of others whereby the petitioner reacquired its common stock and the former stockholder received a land contract in lieu thereof.

Chapter 402 of the Wisconsin Laws of 1919, which created section 1771 (b). and amended section 1772 (a) (9) of the Wisconsin Statutes (petitioner's Exhibit 1), expressly granted so-called "housing corporations" all general powers of other domestic corporations enumerated in section 1748 of the Wisconsin Statutes, except subsection (8) thereof, relating to the insurance of officers, and in addition thereto authorized corporations organized thereunder, among other things, to acquire and plat land, to erect dwellings on land owned by it and to otherwise improve and develop said land, except that no single dwelling should be erected at a cost to exceed $5,000, and to lease for indefinite periods parcels of land together with the improvements thereon, at terms fixed by the corporation. Subsection (3) thereof provided that no land should be sold except land not necessary or desirable and that nothing thereon should be construed as preventing the sale of land in proceedings to wind up the corporation or in foreclosure of mortgages or other liens thereon. Subsection (4) provided that no lease of any land or buildings thereon should be made except to a stockholder of the corporation and no tenant should hold stock beyond the value of the premises occupied by him. Subsection (6) provided that no stock should be issued except in consideration of money or labor or property estimated at its true money value equal to the par value thereof. It provided that no dividends should be declared on any stock until a fund should have been created equal to 2 per cent of the authorized capital, that no dividends should ever be declared which would impair the capital or such surplus fund, and that no dividends should be paid in any year to a stockholder not a tenant exceeding 5 per cent of the par value of stock held by him. Such subsection also provided that in each and every year in which a profit was made, 10 per cent of such profits should be set aside for the purpose of retiring preferred stock. Subsection (8) provided that each share of stock, either preferred or common, should be entitled to one vote. Subsection (9) provided that the directors should receive no compensation until the surplus fund of 2 per cent of the capital had been set aside and until dividends on preferred stock had been paid and that at no time should the compensation of directors exceed $500 per annum.

In the articles of organization (petitioner's Exhibit 2) we find that the business of the petitioner shall be " to acquire " land, " to erect dwellings," " to improve and develop " land and " to lease and sell " land. The capital stock consisted of 2,500 shares of preferred stock and 2,500 shares of common stock, both of the par value of $100 a share. The preferred stock was entitled to receive cumulative dividends of 5 per cent " when and as declared from the surplus or net profits of the corporation," but no dividends were to be paid on preferred stock until a fund equal to 2 per cent of the authorized capital stock had been created, nor were any dividends ever to be declared which would impair the capital or such surplus. Ten per cent of " profits " were to be set aside each year for the retirement of preferred stock and all profits remaining after payment of dividends of 5 per cent per annum on both preferred and common stock, were to be added to such fund until all preferred stock had been retired.

It is obvious from the language of section 1771b, *supra*, and the articles of organization that it was contemplated that the operations of the petitioner would yield a profit and that the holders of preferred and common stock were not entitled to any return on the stock unless and until a profit had resulted from the operations of petitioner. Neither its capital nor the fund of 2 per cent of its authorized capital was to be impaired by payment of dividends. There is no evidence from which we can determine whether such fund or the fund to retire preferred stock was ever created. Nor is there any evidence to show out of which funds the dividends paid to preferred stockholders were taken. However, we must assume that the petitioner paid such dividends pursuant to law and its articles out of its profits and without impairment of capital.

The mayor of Milwaukee who initiated the organization of the petitioner testified at length with respect to the purposes and intentions of himself and others in organizing the petitioner. He testified further as follows:

At this stage of the game, [after receiving the report of the Commission] oral conversations took place between the Commission and myself. A statute of some kind was authorized to be drafted and they told me what they wanted was a cooperative housing plan, something that I had not studied and knew very little about. I believe M. Schuchardt was most instrumental in influencing the Commission to adopt this plan, because Mr. Fred Vogel personally wanted the city to advance all the money and build the houses. He said, " We need money, and we need it cheaply, and that is the way to get it "; * * *

He testified at some length as to his conversations with prospective stockholders and the explanations and inducements made to secure subscriptions. He attended but one or two meetings of the board of directors, feeling that it was not proper for the mayor

to take part in the business management of the petitioner, but he had frequent conferences with directors and received reports at frequent intervals. He testified that " it was our intent " to work out a plan of building homes at cost; to build homes of smaller type, so that those who could not afford to own a home could at least have the ownership of the stock in the enterprise, and:

Next, that all the benefit that could be achieved outside of the five per cent to pay on this preferred stock belonged to the common stockholders, or the owners of the homes, the owners of the enterprise, that there should be no such thing as a profit, and there could not be, under the law, unless, as a matter of law, it is deemed a profit but in the minds of the incorporators it was impossible to have any such thing as a profit.

And again:

* * * I am not positive in my testimony on that point, as to whom the money was to be paid back to, but it was to be either to the occupants at a certain time of those houses, so that no one could ever receive any profit out of this enterprise, because I know that the Superintendent who did the work and the Secretary who did the work for months and months, did so without salary. The architects' times were supplied by Mr. Schuchardt. The Building Inspector did his work without charge, and the Health Commissioner. I never had expected any compensation. It was a semi-public enterprise, to demonstrate in a whole-hearted way that we could prove that anywhere on this continent, if they wished to do as we had done, employers and employees could come together and build homes, without any speculation, without any profit, and receive all the benefit from wholesale production.

That was substantially the theory all the way through, and that was the spirit that enthused everybody to make this a success, and it has attracted attention all over this country.

However much we may be impressed with the original intentions and purposes of those who were instrumental in organizing the petitioner, we find as a result of their efforts an existing law, articles of organization, conduct under them and books of account which we can not disregard.

After its organization the petitioner sold preferred stock to obtain money for the purchase of land and the construction and erection of homes thereon. The money thus secured not being sufficient for such purpose, the petitioner borrowed money from a bank or banks. It sold its common stock to prospective tenants. These stockholder-tenants were required to execute an agreement in the form of a lease and subscription to common stock (petitioner's Exhibit 5). Under these agreements an initial payment and a monthly payment were prescribed, the initial payment being applied as a payment on the subscription for stock.

The fifth paragraph in the agreement providing for the monthly payment does not in express terms designate the monthly payments as rent. In such paragraph, however, the party agreeing to pay

such monthly payment is named as lessee and the payments are to continue for the duration of the lease. It does not provide that such payments are to be applied on the stock purchased nor that the monthly payments were to cease when the payments aggregated the total par value of stock subscribed. The seventh paragraph of this agreement provides that "to secure the payment of all rental payments accruing hereunder, and all debts and liabilities arising because of the relationship created by this instrument" the lessee grants and gives to the petitioner a lien on all shares of the petitioner in his name on the books of the petitioner for the amount of such indebtedness or liability as may arise hereafter because of the lessee's failure to comply with the rules, regulations and conditions and covenants set forth in the agreement. The " rental " mentioned in the seventh paragraph must therefore refer to the monthly payments provided in the fifth paragraph of the agreement.

Rule A in the agreement provides that all "rental payments" must be paid within five days from due date and, if not paid within such time, such payments are to be increased as therein provided. The only payment provided for in the agreement which is to be paid on a day certain is the monthly payment provided for in the fifth paragraph.

The sixth paragraph of the agreement contains the subscription agreement and expressly states the total amount to be paid for the stated number of shares of the common stock of the petitioner subscribed for by the tenant-stockholder, and the amount of the initial payment thereon, and also provides how the balance thereof is to be paid, i. e.:

\* \* \* and the balance thereof from time to time by the application thereon of all dividends declared and paid on any of the said shares of stock provided always that the lessees may make other and additional payments on such subscription. for stock upon such terms and conditions as may be hereafter adopted in that behalf by the company.

Rule E in the agreement provides that resident stockholders coming within the rule " will have credited to them stock remitted to them during the month of January one per cent of all the monthly payments made during the previous year." A column on the distribution page or sheet of the pass book has a heading of " Credit to Upkeep of Property," which, no doubt, refers to the credit provided for in Rule E. This is followed by four columns with the following headings:

Monthly Payments Applied to Stock
Dividends Paid Up on Stock ·
Direct Payments to Stock
Total Credit to Stock

We are unable to find any provision in the agreement itself from which it may be inferred that any part of the monthly payments were to be applied on stock subscriptions except as may be implied from the heading "Monthly Payments Applied to Stock." The credit of 1 per cent, whether taken out of the monthly payments or out of earnings or profits of the petitioner, was in the nature of a retroactive reduction of rental, or a bonus to the tenant-stockholder who kept the premises in neat condition throughout the year and who made repairs due to causes other than natural deterioration at his own expense.

David M. Harper, bookkeeper and clerk of the petitioner from February 1, 1922, to July 31, 1925, testified that the entries in the pass book presented in evidence and entries made in a tenant-stockholder's account in the books of account shown to him at the hearing were in his handwriting and that the monthly payments of each and every individual common stockholder were handled in the pass book and on the corresponding account in the books of account of petitioner in the same manner. From his testimony that such entries were in his handwriting and that the entries in the account of a tenant-stockholder in the books of the petitioner and the entries in his pass book were handled in the same manner, we can not assume that the bookkeeper made such entries in the pass books or in the books of account of petitioner arbitrarily or in error or without authority or instructions.

The petitioner in its brief states that " There was no charge for the use or occupancy of the premises "; that " the pass book clearly discloses that no rents were receivable but that a specified amount was payable per month by the subscriber on his common stock liability," and that " the petitioner was required " under section 1771b (4), upon termination of a lease and cancellation of stock " to refund to such stockholder ' the amount paid thereon (petitioner's common stock) less any lawful claims of the corporation against said stockholders '; and that the provisions of this section and refund of the total amount paid in on the stock conclusively rebuts any claim that the payments were or could be rent."

That rent was to be paid by tenant-stockholders and that the organizers of the petitioner had such payments in mind at the outset, as they were instrumental in drafting the statute and procuring its enactment, is disclosed by section 1771b (10), *supra*, which provides that the directors shall fix the value of lots to be used for residential purposes and that thereafter in computing the price to be paid *for the rental* thereof, a valuation of the lot not exceeding that placed thereon shall be used, and by section 1771b (2) (c), which empowers the petitioner to lease its property at terms fixed by it.

There is no evidence as to the amounts actually refunded by the petitioner to tenant-stockholders on the termination of leases. There is no evidence that the petitioner refunded all monthly payments to stockholders, together with the initial payment on stock, dividends, the credit of 1 per cent provided for in Rule E, and other payments. The only evidence in the record in this regard is that contained in the assignment to petitioner of 45 shares, which assignment is attached to the inside front cover of the pass book, covering lot 4 in block 9 (petitioner's Exhibit 5). This pass book discloses that cash payments in the total sum of $1,580, including initial payment of $500 on stock subscription and 24 monthly payments of $45 each, were made to the petitioner. The assignment was executed October 16, 1925, and states a consideration of $829.58 as in hand paid to the tenant-stockholder by the petitioner. The petitioner, therefore, retained $750.42 out of cash payments made by this tenant-stockholder. This does not take into consideration any dividends or other credits to which the tenant-stockholder may have been entitled at that time. There is no evidence as to what disposition was made of the money thus retained by the petitioner, or how this transaction was recorded in its books of account.

Section 1771b (4) (chapter 402, *supra*) provides that the petitioner shall be liable to the stockholder for the amount paid for stock at the termination of his lease. However, under this section, the lawful claims of the corporation against the stockholder could be offset against the amount paid in for stock. Surely a lawful claim against a stockholder would accrue to petitioner if the tenant-stockholder failed to pay rental, to secure the payment of which it was granted a lien upon the stock subscribed.

Dividends paid to its preferred stockholders were not interest payments on loans as contended by the petitioner. *Mobile & Ohio R. R.* v. *Tennessee*, 103 U. S. 486; *Fruit Growers Supply Co.*, 21 B. T. A. 315; *Finance & Investment Corporation*, 19 B. T. A. 643 affd., 57 Fed. (2d) 444; *Riverdale Co-operative Creamery Association*, 18 B. T. A. 1159; affd., 48 Fed. (2d) 711.

Section 202 (a) of the Revenue Act of 1921, and section 204 (a) of the Revenue Acts of 1924 and 1926 provide that the basis for determining gain or loss from the sale or disposition of property acquired after February 28, 1913, shall be the cost of such property. No evidence was presented from which we can determine the cost of the land purchased, the cost of the dwellings erected, taxes or other items capitalized, or any other costs, depreciation, sale price or other items to be considered in computing loss or gain on the sale of property for cash or on land contract. There is no evidence that lot 4 in block 5, together with dwelling thereon, was sold to the tenant-stockholder for $4,500, the amount of the total par value of stock subscribed, or

that such amount represented cost of lot and house and estimated carrying charges. We do not know how the monthly payments or amount of stock to be subscribed by tenants were determined. However, in the petition, in Docket No. 42635 it is alleged that "The price fixed for the common stock was equal to that portion of the total cost allocated as the cost of the dwelling desired to be acquired," and in section 1771b (10), *supra*, it is provided that in computing the rental a valuation of the lot not exceeding that fixed by the directors shall be used.

From the evidence in the record we are unable to determine the taxable income of the petitioner, except as it appears from the statement of analysis of income per books of the petitioner. There is no evidence from which we can determine the total number of shares of common stock subscribed and the total amounts paid thereon, nor was evidence presented which authorized any assessment upon stock above its par value, or that such assessments were in fact made and paid. In fact, there is no evidence in the record to aid us to determine amounts properly distributable to capital, gross income and deductions except as can be gleaned from the statements of analysis of income per books (petitioner's Exhibit 8) and of preferred stock dividends paid (petitioner's Exhibit 11), the income shown on such statement of analysis of income per books being receipts of petitioner allocated by it on its books of account to income accounts.

Section 213 (a) of the Revenue Acts of 1921, 1924, and 1926 provides that gross income shall include " gains, profits, and income derived from   *   *   *   sales, or dealings in property, whether real or personal growing out of the ownership, or use of or interest in such property; also from interest, rent,   *   *   *   or gains or profits and income derived from any source whatever."

All the income of the petitioner shown on the statement of analysis of income allocated to rents, profit on real estate sales, fines (delinquent rentals), interest earned and discount earned, are within section 213 (a), *supra*. The item of " Refund of Service to Curb Charge " was treated as income by the petitioner on its books of account and there is no evidence from which we can determine that this was an error on its part or that it was not in fact income.

The resolutions adopted by the board of directors of petitioner on December 14, 1928, and October 30, 1930, provide for the distribution to home owners of certain funds designated therein as " any surplus in the nature of a marginal overcharge, or otherwise," " undivided overcharge," " net overcharge," etc. These resolutions were not adopted in any of the years herein involved but in later years. However, the determination of receipts as income for the purpose of income and profits tax depends upon the manner and circumstances sur-

rounding the receiving thereof and not in the disbursement or distribution or use thereof. *Standard Slag Co.*, 20 B. T. A. 503.

No evidence was presented with respect to real estate taxes or real estate commissions alleged to have been erroneously set up on the books as capital charges and disallowed by respondent as deductions.

Chapter 321, *supra* '(section 180.04 (11), Wisconsin Statutes), made provision for the dissolution of housing corporations by resolution of at least a majority vote of all stock, common and preferred, after which vote the affairs of the corporation were to be placed in the hands of a trustee elected by the directors. There is no evidence that petitioner was so dissolved or that any steps were taken to this end except that it sold its realty.

We can not treat the corporation as a mere medium or agent through which the tenant-stockholders transacted business, the agent merely being reimbursed for its expense and the tenant-stockholders, as principals, receiving all profits, which in turn were not profits to them, but a mere reduction of cost. That a corporation is separate and distinct from its stockholders has been recognized by the United States Supreme Court. *Eisner* v. *Macomber*, 252 U. S. 189.

The Supreme Court of Wisconsin is of the same view and in *In re Gerlach's Estate*, 177. Wis. 251; 188 N. W. 94, it states in its opinion therein that it is fundamental that until profits of a corporation are distributed in the form of a dividend or otherwise the stockholder obtains no right or title thereto; that such profits belong exclusively to the corporation and may be retained by the corporation and added to corpus.

The foregoing covers assignments of error (a), (b), (c) and (d) in Docket No. 42635 and assignment of error (a) in Docket No. 46035. Since the burden of proof rests upon the petitioner and since it has failed to produce sufficient evidence from which we can determine that the respondent erred in his determination of deficiencies in the years 1923 to 1927, inclusive, we must approve such determination.

The petitioner alleged in assignment of error (e) in Docket No. 42635 that the respondent erred in not exempting the petitioner from taxation for the reason that it is a "municipal enterprise."

Counsel for petitioner, in his opening statement at the hearing in this proceeding, stated that the petitioner was exempt as (1) a domestic building and loan association, (2) a cooperative association and (3) a civic enterprise, and that "Obviously, it is not a municipal corporation. It may be questioned whether it is a municipal agency, but it is a civic enterprise."

However, in its brief at the end of its argument with respect to its exemption from taxation as a building and loan association, peti-

tioner refers to the public character of the petitioner and that the provision in the statute (section 1771b (7), *supra*) authorizing municipalities to subscribe for the preferred stock stamped the entire project as one of a public nature, since municipalities have no power, and none could be delegated to them by the legislature, to use taxes except for public purposes, citing *Attorney General* v. *City of Eau Claire*, 37 Wis. 400; and *Wisconsin Keeley Institute Co.* v. *Milwaukee County*, 95 Wis. 153; 70 N. W. 68. Though the court in its opinion in the first named case states that the legislature can delegate the power to tax to municipal corporations for public purposes only, it also states that the court can not hesitate in holding that, if the statute under consideration grant power to the city to construct and maintain a dam, for the purpose of leasing the water power for manufacturing purposes, it is a power for a private and not a public use, and can not be upheld.

In *Wisconsin Keeley Institute Co.* v. *Milwaukee County*, *supra*, a law providing for the treatment of habitual drunkards in private institutions at the expense of the county in which they reside was held unconstitutional, the court stating:

* * * We are clearly of the opinion that the act in question is not an exercise of the police power as above defined. On the contrary, it is for private purposes, and to benefit private parties. The plaintiff is a private corporation, organized under the general laws of the state, and conducted for private gain. The mere fact that it is subject to visitation and inspection by public officials does not make it a public institution. * * *

The petitioner herein is a private corporation organized in 1921 under chapter 86 of the Wisconsin Statutes, general incorporation laws of the State of Wisconsin, and under chapter 402, Laws of Wisconsin of 1919, a part of chapter 86, Wisconsin Statutes, 1921, and was engaged in a business of a kind ordinarily carried on for profit. The petitioner was given no authority to levy a tax and the city was not authorized to levy a tax for the use of petitioner. That the city and county were authorized under chapter 402, *supra*, to subscribe for its preferred stock did not change the character of the petitioner. The fact that persons who were officers and employees of the City of Milwaukee assisted in its promotion and organization, rendered services without receiving compensation therefor from the petitioner, and were directors or officers of the petitioner does not change its character. There is no evidence that certain of these officers and employees were not required to, and did not render, without charge therefor, the same or similar services to other persons or corporations in the same or similar lines of activity or business. That the officers and employees rendered more or greater services without charge to the petitioner than they would to other private corporations and persons erecting and constructing dwellings is

readily understandable from all the facts. Although the city officials and employees, as well as certain citizens who purchased the petitioner's preferred stock, were interested in the enterprise and regarded it as a civic organization of a public or quasi-public character and the city purchased its preferred stock, is not decisive as to the character of the petitioner. Here, as in *Wisconsin Keeley Institute Co.* v. *Milwaukee County*, *supra*, we have a private corporation organized for private purposes and for the benefit of private parties. See *New State Ice Co.* v. *Ernest A. Liebmann*, 285 U. S. 262; also, *Uniform Printing & Supply Co.*, 9 B. T. A. 251; affirmed in *Uniform Printing & Supply Co.* v. *Commissioner*, 33 Fed. (2d) 445.

The petitioner, therefore, is not exempt from taxation as a "municipal enterprise."

The petitioner contends that it is exempt from income and profits taxes as a domestic building and loan association.

Section 231(4) of the Revenue Acts of 1921, 1924 and 1926 does not define a building and loan association. However in *United States* v. *Cambridge Loan & Building Co.*, 278 U. S. 55, the Supreme Court of the United States in its opinion states:

\* \* \* The statutes speak of " domestic " associations, that is, associations sanctioned by the several States. They must be taken to accept with the qualifications expressly stated what the States are content to recognize, unless there is a gross misuse of the name. \* \* \*

Section 2009 of the Wisconsin Statutes, 1921, a part of chapter 93 captioned "Mutual Loan and Building Association," provided that the words "building and loan association" should form a part of the name of every local association thereafter organized and that no corporation not organized under the statutes applicable to such associations should be entitled to use a name embodying such words. Section 2010, Wisconsin Statutes, 1921, provided that the articles of incorporation, amendments thereof and all papers relating thereto should be filed with the commissioner of banking, who might issue the certificate of incorporation, and fixed the fee therefor at $10, which was later increased to $25. Section 2011 which stated the powers of such associations provided in subsection (3) thereof as follows:

To acquire, by purchase or otherwise, only such real estate as may be necessary for the protection of its securities and the collection of any claims or debts due to it; and all the same shall be sold within ten years from acquiring title thereto.

Sections 2014–12, 13 and 14, provided that such associations should be under the control of the commissioner of banking. The commissioner of banking was required to cause the affairs of such associations to be examined, and such associations were required to keep

their books and accounts in such manner as to enable the commissioner to readily ascertain the true condition of their affairs. These statutes as amended from time to time are now incorporated in chapter 215, Wisconsin Statutes, 1929, under the caption " Building and Loan Associations," and the provisions above referred to were retained in substance.

The petitioner was organized in 1921 under chapter 86 of the Wisconsin Statutes and in particular chapter 402, Laws of Wisconsin, 1919, section 1771b of chapter 86. There is no evidence that the petitioner was organized as a building and loan association, that it complied with the laws of the State of Wisconsin relating thereto, or that it was recognized or sanctioned as such by the State of Wisconsin.

In *United States* v. *Cambridge Loan & Building Co.*, *supra*, the court further states:

The rudimentary form of such associations is supposed to be a society raising by subscription of its members a fund for making advances to members in order to enable them to build or buy houses of their own. A member is entitled to borrow on sufficient security an amount equal to his subscription for shares and when the shares are paid up by the installment payments required and the profits of the company his indebtedness is cancelled. * * *

Petitioner contends that the use of the words " housing corporation " in the statute is equivalent to denominating petitioner a building and loan association. We do not concur in that view, but are of the opinion that, if the Legislature of Wisconsin had intended such corporation to be classed as a building and loan corporation, it would have so stated or made chapter 402, Wisconsin Laws of 1919, a part of chapter 93, Wisconsin Statutes, 1921, relating to building and loan associations.

That such was not the intention of the Wisconsin Legislature is shown not only by the inclusion of section 1771b in chapter 86 of the Wisconsin Statutes, but also by the amendment of section 1772 (a) (9) by chapter 402, Laws of Wisconsin of 1919. This section, prior to such amendment, provided that no filing fee was required to be paid by corporations organized without capital stock or exclusively for educational, benevolent, charitable and reformatory purposes, the articles of which provided that no dividends or pecuniary profits be declared or paid to the members thereof. The amendment added to the above list of corporations housing corporations formed under section 1771b, *supra*.

If, as contended by the petitioner in its brief, the Wisconsin Legislature, in thus amending section 1772 (a) (9), placed housing corporations in the same class with educational, benevolent, charitable and reformatory corporations, such amendment, in our view, tends

further to show an intention on the part of the legislature not to class housing corporations with building and loan associations. That building and loan associations and educational, benevolent, charitable and reformatory corporations, the members of which are not to receive any dividends or pecuniary profit, are within two different and distinct classifications, is obvious.

We are of the opinion that the petitioner is not a building and loan association and that the determination of the respondent in this respect must be approved.

The petitioner further contends that it is exempt from taxation as a civic league.

Section 231 (8) of the Revenue Acts of 1921, 1924 and 1926 provides that civic leagues or organizations not organized for profit, but operated exclusively for the promotion of social welfare, are exempt from taxation under such acts.

Two conditions, therefore, must exist to entitle a civic league to exemption from taxation. Although such organization may be operated exclusively for the promotion of social welfare, yet, if it be organized for profit, it is not exempt from taxation.

Since we have held that the petitioner was organized for profit, it does not come within the above exemption, even though it may have been operated exclusively for the promotion of social welfare, which we do not determine.

The petitioner contends that it is exempt from taxation under section 231(11) of the Revenue Act of 1924 and section 231(12) of the Revenue Act of 1926, as an association within the meaning of such sections organized and operated on a cooperative basis for the purpose of purchasing supplies and equipment for the use of members and turning over such supplies and equipment to them at actual cost, plus necessary expenses.

The above sections exempt " farmers', fruit growers' or like associations " from taxation under certain specified conditions, and to be exempt thereunder the petitioner must not only come within the classification of associations enumerated, but must also meet the conditions prescribed in the statute. It is a well recognized rule of construction, known as the doctrine of " ejusdem generis," that where general words follow particular words or enumeration of particular classes of persons or things, the former must be construed as applicable to the things or persons particularly mentioned. *Prussian* v. *United States*, 282 U. S. 675;36 Cyc. 1119–1120, and cases cited.

It seems to us that by the inclusion of the word " like " it was intended that such rule of construction should be applied, thus limiting the associations exempt from taxation under such section to

farmers', fruit growers' and other associations of " like " kind, nature or character.

The petitioner relies particularly on section 231(12) of the Revenue Act of 1926 and emphasizes the fact that chapter 402 of the Wisconsin Laws of 1919 provides that " no dividend shall be paid in any year to a stockholder not a tenant of the corporation exceeding 5 per cent of the par value of the stock held by him." Section 231(12), *supra*, provides that exemption shall not be denied because the association has capital stock if the dividend rate does not exceed 8 per cent per annum. However, there is added to such provision in the conjunctive the following:

\* \* \* and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association; \* \* \*

Although chapter 402, *supra*, did not limit or restrict the leasing of homes constructed and owned by the petitioner, to its common stockholders, the record discloses that the homes were leased only to subscribers to the common stock. The preferred stock was sold first to acquire capital with which to purchase land and to commence operations. The authorized capital consisted of 2,500 shares of preferred stock and 2,500 shares of common stock. The holders of preferred stock were entitled to a vote for each share of stock held by them, under chapter 402, *supra*. All the preferred stock was issued and outstanding, but we have no information as to the total number of shares of common stock paid for and outstanding or the total number subscribed for. In any event the authorized preferred shares were equal in number to the authorized common shares. At the outset the preferred stock had voting control of the petitioner and from what appears in the record it may be inferred that voting control remained in the preferred stock throughout. Mayor Hoan testified that " the preferred stock was to have a vote and *manage the corporation*, and *the common stock, as it was paid for, was to have votes;* so that ultimately the common stock would become the owners of the enterprise." This expectation was not realized, as it was found necessary to recall and cancel all common stock.

Assuming that the common stockholders were " producers " within the meaning of section 231(12), *supra*, which they were not under the facts in this proceeding, it can not be maintained under the proof in this proceeding that substantially all of the capital stock was owned by producers who purchased their supplies or equipment from the petitioner. A " producer " is " one who produces," " one who grows agricultural products, or manufactures crude materials into

articles of use." Webster's New International Dictionary, 1929. We do not believe that any one would seriously contend that the stockholders of petitioner, either preferred or common, were producers as used in section 231 (12), *supra*.

In its brief the petitioner states that " It is true it did not purchase supplies and equipment in the strict sense, but it did purchase and construct homes for the use of members and turned over the same to them at actual cost plus necessary expense." Suffice it to say that statutes granting exemption from taxation are strictly construed and the burden is upon the petitioner to show that it comes within their provisions. *Northwestern Drug Co.*, 14 B. T. A. 222; *Farmers Co-operative Milk Co.*, 9 B. T. A. 696.

In our opinion the petitioner is not an association exempt from taxation within the purview of section 231 (11) of the Revenue Act of 1924 or section 231 (12) of the Revenue Act of 1926.

In the deficiency letter mailed December 11, 1928, a penalty for delinquency in filing the return was asserted for 1925 and 1926, since no return was filed for those years, and in the deficiency letter mailed August 17, 1929, a like penalty is asserted, since the return for the calendar year 1927 was filed on January 18, 1929, instead of on or before March 15, 1928.

No error in this respect was assigned by the petitioner in its petition in either Docket No. 42635 or Docket No. 46035. No evidence was produced showing the imposition of such penalty to be improper. The action of the respondent in asserting penalties for the years 1925, 1926 and 1927 must, therefore, be approved. *112 West 59th St. Corporation*, 23 B. T. A. 767; *C. C. Humphries et al.*, 17 B. T. A. 811; *Hammond L. Kington*, 8 B. T. A. 981.

Reviewed by the Board.

> *Judgment will be entered for the respondent.*

MATTHEWS concurs in the result.

LANSDON and GOODRICH dissent.