LAKE FOREST, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 77061, 81891.   Filed June 19, 1961.

*Wallace C. Murchison, Esq.*, for the petitioner.
*Richard C. Forman, Esq.*, for the respondent.

TRAIN, *Judge:*   Respondent determined deficiencies in the petitioner's income tax for the year of April 1, 1948, to June 30, 1948,

and for the fiscal years ended June 30, 1949 to 1956, inclusive, in the following amounts:

| Fiscal year ended June 30— | Deficiency | Fiscal year ended June 30— | Deficiency |
|---|---|---|---|
| 1948 | $3, 515. 63 | 1953 | $8, 915. 01 |
| 1949 | 7, 828. 97 | 1954 | 1, 491. 79 |
| 1950 | 11, 464. 95 | 1955 | 4, 077. 44 |
| 1951 | 4, 355. 47 | 1956 | 398. 83 |
| 1952 | 11, 688. 32 | | |

By amended answer in Docket No. 81891, respondent has requested that the Court determine additions to the deficiencies for the fiscal years 1955 and 1956 in the amounts of $2,126.85 and $2,612.78, respectively.

The issues are:

(1) Whether petitioner is exempt from taxation for the fiscal years ended June 30, 1954, and the prior years in question pursuant to either section 101(8) or 101(10) of the Internal Revenue Code of 1939, and for the subsequent years in question pursuant to either section 501(c)(4) or 501(c)(12) of the Internal Revenue Code of 1954. If petitioner is not so exempt, the following issues are also to be decided:

(2) Whether the period of limitation upon the assessment of deficiencies for each of the years 1948 through 1950 bars respondent's assessment of deficiencies for those years;

(3) Whether petitioner is entitled to deduct depreciation on certain buildings and equipment for the years 1948 to 1955, inclusive;

(4) Whether the principal payments made to petitioner by its members under their mutual ownership contracts were capital contributions or income to petitioner for each of the years in question;

(5) Whether the book credits allocated by petitioner to its members for the years 1955 and 1956 were properly excluded from gross income;

(6) Whether the additional North Carolina income taxes and interest which would be owed for any year in issue for which a deficiency is determined in this proceeding are deductible for such year; and

(7) Whether petitioner was exempt from taxation for the year of April 1, 1947, to March 31, 1948, and if not, whether it sustained a net operating loss in such year which it may carry forward to subsequent years in issue.

Whether or not petitioner suffered net operating losses for the years ended June 30, 1948, 1949, and 1951, and is entitled to the resulting deductions and carryovers depends upon the determination of issues (1), (3), and (4).

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated. Petitioner was incorporated on February 7, 1947, under the laws

of the State of North Carolina as Veterans Homes, Inc., with its office in Wilmington, North Carolina. Petitioner's name was changed to Lake Forest, Inc., by charter amendment dated September 23, 1954.

Petitioner filed its information (Form 990) and income tax returns for the years here involved on an accrual basis with the district director of internal revenue at Greensboro, North Carolina. Its books and records are kept on an accrual basis for a fiscal year ending June 30.

Petitioner was organized by World War II veterans and others who were interested in acquiring two United States defense housing projects in Wilmington, North Carolina, and utilizing the projects on a cooperative, nonprofit basis as homes for petitioner's members. The projects, known collectively and hereinafter referred to as Lake Forest, consisted of 249 one-story concrete block residential buildings, together with administration and accessory buildings, streets, sidewalks, and utilities. The buildings were divided into three-, four-, and five-room apartments or units, with a total of 584 apartments in the project.

The following news story, appearing in the Wilmington News, issue of Friday, August 9, 1946, describes the background in which the petitioner originated:

Legal counsel has been retained by the James A. Manley post of the Veterans of Foreign Wars to conduct a thorough inquiry into the feasibility of purchasing * * * masonry units of the Lake Forest war housing project by a veteran's cooperative, non-profit organization, * * *.

"Cognizant of the difficulties the average married veteran is experiencing in finding suitable permanent housing for himself and family, we of [the post] have engaged the services of * * * a Wilmington attorney, on the behalf of all veterans, whether members of the post or not, who are interested in forming the non-profit cooperative," [the post commander] said.

*     *     *     *     *     *     *

* * * [The attorney] will begin his fact-finding negotiations with Federal Public Housing administration in Washington relative to a possible bid on the masonry units in Lake Forest when that project is declared surplus and placed up for sale sometime this year, * * *.

"The * * * [post] will not purchase the project as an organization * * * [but its officers and its national organization's Washington representative] are being used * * * to facilitate the formation of the corporation which would be composed entirely of * * * veterans interested in buying their own homes in Lake Forest," * * *.

*     *     *     *     *     *     *

"At present, there is no way of ascertaining the number of veterans in Wilmington and New Hanover county who might be interested in participating in the project. Approximately one-half of the permanent units at the settlement are now occupied by veterans of World War II, while it is understood a sizeable waiting list is on file with the Housing Authority of the City of Wilmington, which administers the project. Surveys made by the VFW at the request of several interested veterans indicate that a majority of veterans living at the project are interested in buying their houses," * * *.

*     *     *     *     *     *     *

Priority holders on purchase of this type of property include federal, state and city governmental agencies. After a 30-day period allowed for execution of any of these priorities the property will be advertised for a 60-day period for sale to private bidders. They will not be sold individually.

Petitioner's certificate of incorporation provided that it was organized as a nonstock corporation, pursuant to the general statutes of North Carolina, and further provided *inter alia:*

THIRD : The objects for which the corporation is to be formed are as follows :

(a) To assist veterans of the World Wars to purchase and finance their own homes through acquisition of Lake Forest Projects #N. C. 31021 and #N. C. 31026, and to assist in the construction of residences on the site of said project or the financing of residences already built thereon; and in this connection to negotiate, purchase, and sell, notes, bonds and other evidences of indebtedness; and generally to advance or negotiate loans on city and rural real estate as principal or agent of any corporation, association, firm or individual, and to do all acts necessary to the collection of the principal and interest on any loans or advances so made.

(b) To purchase, acquire, demount, move, transport, re-erect, and sell or rent to veterans of the World Wars, who are eligible tenants or repurchasers, as defined by the Federal Public Housing Authority, houses and other property to be purchased from the United States of America, by and through the Commissioner of the Federal Public Housing Authority or his successor and any successor to his powers, functions and duties; to purchase, acquire, take title to, sell, convey and rent or lease lots, lands or real estate to eligible tenants or repurchasers as defined by the Federal Public Housing Authority, for reconstruction and location thereupon of houses purchased through the Federal Public Housing Authority as hereinabove stated; to aid and assist veterans of the World Wars in procuring, purchasing and leasing houses, lots and homes; to enter into all necessary contracts with the United States of America, the Federal Public Housing Authority or any other bureau, commission, authority or department of said government for the purchase, removal and re-erection of said houses and property, to enter into all necessary and desirable contracts with any individual or corporation for the demounting and removal of said houses, the restoration of lots upon which said houses are now located and for the proper preservation, care, removal and replacements of telephone, electric and other wires or fences, poles or posts, sewer lines and water lines located on said premises; to obtain all licenses and permits necessary to carry into effect the purposes herein set forth; and further to do and perform all things necessary to and incident to the carrying into effect of the purposes hereinabove set out.

(c) To negotiate loans and to buy and generally to deal in notes and bonds secured by deeds of trust, mortgages, or other instruments and to act as trustee under [such instruments] * * *.

(d) To acquire by purchase, lease, or otherwise real estate or any interest therein; to erect and construct houses, buildings or works of every description on any land of the corporation or upon any other lands and to generally enlarge, alter or otherwise improve existing buildings, houses, or works and to convert and appropriate land into and for streets, roads, and other conveniences and generally to deal with and improve the property of the company; to buy, sell, lease, let, mortgage or otherwise dispose of lands, houses, buildings, and other property of the corporation.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(f) In the event the Corporation cannot secure a sufficient number of veterans of World War II and World War I then the projects will be open to other than veterans.

(g) So long as the Federal Government has a financial interest in the aforementioned projects the powers set forth herein shall be exercised only in connection with the acquisition, operation and maintenance of said projects, N.C. 31021 and N.C. 31026, Wilmington, North Carolina.

\*  \*  \*  \*  \*  \*  \*

NINTH: This corporation is not organized for profit and no capital stock is required nor shall any capital stock be issued, and membership in the corporation shall be regulated by its by-laws.

Petitioner's bylaws, adopted February 10, 1947, provided, *inter alia*, that:

It is a non-profit Corporation without capital stock or shares. \* \* \*

### ARTICLE II—PURPOSES

The Corporation has been organized to purchase, operate and manage a housing project on a non-profit basis and in the interest of and for the housing of its members, in connection with such project, the corporation shall provide on a non-profit basis, such community facilities, services and benefits as may be necessary or convenient for the welfare of its members and the usefulness of said project.

In pursuance of said purposes, the Corporation shall enter into an appropriate agreement with the Federal Government for the acquisition of \* \* \* Lake Forest \* \* \*. Should the Corporation acquire or assume the operation of additional housing projects, these by-laws may be amended in order to assure membership on the Board of Directors of resident members of such additional projects.

\*  \*  \*  \*  \*  \*  \*

### ARTICLE V—MEMBERSHIP

Section 1. Membership in the Corporation shall be established by the purchase of a perpetual use of a dwelling in the Project pursuant to a Mutual Ownership Contract. The total membership shall be limited to the number of dwellings in the Project. Members shall be approved by the Board of Directors. Membership in the Corporation shall be accepted on the following preferential basis:

First: Servicemen and veterans of World War II now living in the project and servicemen and veterans of World War II who are not adequately housed. The "servicemen" shall mean persons in the military or naval forces of the United States who served therein during World War II. The term "veteran" shall mean persons who have served in the military or naval forces of the United States during World War II. The terms as used herein shall include members of the immediate families of deceased or absentee servicemen and of deceased veterans.

Second: Veterans of World War I who are not adequately housed.

Third: Veterans of World Wars regardless of present housing accommodations.

Fourth: Other eligible persons.

Compliance with the above prescribed preferences shall be deemed accomplished if no member from a subordinate classification is accepted until thirty (30) days have elapsed without application from an eligible applicant from a superior classification.

Section 2. Membership in the Corporation shall entitle a member to take part in the affairs of the Corporation. Each member shall be entitled to one vote upon all questions coming before any and all meetings of the Corporation.

Section 3. Applicants for membership shall: (i) furnish such information as the Board of Directors may require and (ii) agree in writing to abide by the by-laws and all rules and regulations of the Corporation.

Section 4. The membership fee shall be ten dollars ($10.00). Certificate of membership shall not be issued until such fee has been paid. Each certificate of membership shall be numbered in order and entered in the membership book of the Corporation. Such certificate shall exhibit the member's name, recite his membership in the Corporation, contain a statement of the provisions of Section 8, Article VIII herein, have plainly printed on its face the word "Non-transferable" and be signed by the President of the Corporation and bear the seal of the Corporation, attested by the Secretary.

Section 5. Certificates of membership shall not be transferable.

Section 6. Membership in the Corporation shall automatically cease upon the termination of the member's Mutual Ownership Contract, as therein prescribed or by the sale, transfer, or other alienation of such contract or the perpetual use purchased thereunder. Termination of membership shall be recorded in the membership book. Upon termination of membership, the former member shall surrender his certificate to the Corporation.

Section 7. The Board of Directors may at any time make a formal complaint against a member of the Corporation, if the Board is of the opinion that such member has violated any of the provisions of these by-laws, or has been guilty of conduct detrimental to the Corporation, or for any reason is undesirable as a member. After service on such member of a copy of the complaint, and a hearing by the Board, upon the member's written request for such hearing, his or her membership in the Corporation may be terminated by the affirmative vote of four (4) members of the Board of Directors.

\* \* \* \* \* \* \*

## ARTICLE IX—NON-PROFIT REQUIREMENTS

Dwelling units and other services and necessities shall be made available to the members of the Corporation at no profit to the Corporation. The Charges therefore, as determined by the Board of Directors, shall be sufficient to enable the Corporation to meet its property-purchase amortization payments to the Government, pay fixed and operating expenses and build up necessary reserves including a general reserve for contingencies and special reserve to take care of repairs, maintenance, replacements and vacancies.

\* \* \* \* \* \* \*

## ARTICLE XIII—DISSOLUTION

Upon dissolution the assets of the Corporation shall be distributed in the following manner and order:

(1) By payment of all debts of the Corporation including expenses of dissolution.

(2) By payment to each member of an amount equal to the amounts paid by such member and credited to the amortization of principal indebtedness pursuant to his or her Mutual Ownership Contract.

(3) By donating any remaining assets to the State of North Carolina.

If upon dissolution the assets of the Corporation after payment of debts are not sufficient to refund the principal payments of all members as provided in

subparagraph (2) above, then in such event said assets will be prorated among the members on the basis of their respective equities.

\*      \*      \*      \*      \*      \*      \*

### ARTICLE XV—AMENDMENTS

These By-Laws may be amended by two-thirds vote of the members present and voting at any regular or special meeting, provided that quorum as prescribed in Section 6, Article VIII herein, is present at any such meeting and provided further, that so long as the Federal Government has a financial interest in the Project, no amendment shall be presented to the members or voted upon unless it has received the written approval of the Commissioner of the Federal Public Housing Authority or his successor in relation to the Project, or the duly authorized representative of said Commissioner or said successor. \* \* \*

Petitioner's certificate of incorporation and bylaws also provided that members would hold quarterly meetings and elect annually a five-man board of directors which would elect petitioner's officers and manage its affairs.

In March 1947 petitioner entered into a contract with the Federal Public Housing Authority (this agency and its successor, the Public Housing Administration, will be hereinafter referred to as PHA) to purchase Lake Forest at a price of $1,797,000, of which 5 percent was payable upon delivery of the deed and the balance in monthly installments over a 25-year period, with 3½-percent interest. The deferred balance was to be secured by a first mortgage on the property. For an interim period of up to 1 year from April 1, 1947, the contract gave petitioner possession and management of the project in order that it could acquire members, obtain the downpayment, and obtain experience in operating the project, under PHA supervision. The contract required petitioner to secure PHA approval before amending its charter, bylaws, or regulations and to maintain its status as a nonprofit corporation. Exhibits attached to the contract prescribed the form of note and mortgage for the deferred balance of the purchase price, the mutual ownership contract between petitioner and its members, and applications for membership.

Petitioner took possession of the project on April 1, 1947, and operated it under the contract for 1 year, collecting rents from tenants and paying operating expenses in accordance with the PHA-approved budget. During this period petitioner proceeded to execute with each of its members a mutual ownership contract in the form prescribed by PHA. Each mutual ownership contract, as amended with PHA approval about the time petitioner received a deed for the project, contained in substance the following provisions:

Petitioner acknowledges payment of a $10 membership fee and extends all rights and privileges of membership to the member. Peti-

tioner agrees to sell and member agrees to buy a right of perpetual use and enjoyment of a specified dwelling unit in Lake Forest at a price of $2,804 for a three-room apartment, $3,011 for a four-room apartment, or $3,392 for a five-room apartment. The perpetual use will be delivered if and when petitioner receives a deed to the project. The member agrees to pay, prior to delivery of the perpetual use, a cash downpayment of 5 percent of the stated price, and the balance of said price, with 3½-percent interest, in equal monthly installments of $13.34, $14.32, or $16.13, based upon the size of the unit. In addition, the member makes monthly operating payments to cover estimated costs of operating services, utilities, and reserves provided by petitioner. The monthly principal and interest payments are calculated to terminate in 25 years but the operating payments continue during the life of the contract. If the member cannot make his monthly payments because of illness or unemployment, he may defer the payments for a reasonable time.

The member occupies the apartment as a private dwelling for himself and his immediate family and has the use of community property and facilities. With petitioner's consent he may sublease his apartment temporarily.

Petitioner provides management and administration of the project, pays property taxes and assessments, provides fire insurance on the project, including all dwellings, provides reasonable amounts of water, gas, and electricity, sets up reserves for vacancy and collection losses and future physical replacements, and pays for necessary current repairs of project property, including dwellings, with responsibility on the member to maintain the grounds around his dwelling and take care of minor interior repairs and interior painting.

With petitioner's approval, the member may move into another apartment in the project, but he pays for redecorating his former dwelling and adjusts his monthly payments if the new unit is a different size. The member may transfer his perpetual use or his mutual ownership contract by gift, bequest, assignment, or otherwise to anyone, but if the transfer is outside his family the transferee can occupy the premises only with petitioner's approval. If the member wishes to leave the project, petitioner has the option but not the obligation to repurchase his perpetual use at a reduced value, less the unpaid balance of the purchase price and the estimated cost of redecorating the unit. If petitioner waives its option the member may sell his perpetual use and assign his contract to any person accepted by petitioner, which person then enjoys the privileges and is subject to the obligations of the member under the contract.

If the member defaults in his monthly payments or violates the mutual ownership contract, petitioner may terminate it on 10 days' notice. If petitioner's directors by a four-fifths vote, after notice and hearing, determine that a member is undesirable as a resident in the project, petitioner may terminate the contract. Upon termination petitioner has the option to buy the perpetual use on the same terms as above mentioned. Upon termination for any reason, the member surrenders the dwelling without notice or other proceedings and in as good repair and condition as received, ordinary wear and loss by casualty excepted. The member agrees to promote the mutual ownership principles of petitioner, abide by its rules and regulations, and cooperate to achieve high standards of home and community conditions.

On or about April 1, 1948, petitioner received a fee simple deed to the project, made the downpayment of $89,850, and executed the note and mortgage to the United States, securing the balance of $1,707,150. The mortgage contained customary provisions securing payment of the debt and providing for foreclosure in the event of default. In addition, the mortgage provided in substance that: Petitioner should not lease or otherwise dispose of any interest in the mortgaged property except by mutual ownership contracts and by leasing dwellings on which such contracts were not outstanding. Petitioner should preserve its status as a nonprofit mutual housing corporation, impose no inequitable or unreasonable restrictions upon membership or participation therein, provide for one vote per member, admit to membership one representative per apartment, issue no stock and pay no dividends or make distributions of surplus earnings, and make no amendment of its certificate of incorporation or bylaws without the consent of PHA. Petitioner should at its expense keep the project in good repair and insured against fire and casualty in amounts approved by PHA, and should maintain funded reserves for replacements and for vacancy and collection losses. Petitioner should operate the project on a mutual ownership basis, selling rights of perpetual use and enjoyment of dwelling units to members under mutual ownership contracts. The aggregate of the original assigned prices of such rights for all 584 units, as set forth in the mortgage, equaled petitioner's purchase price for the project; the total cash downpayments of members under their mutual ownership contracts equaled the downpayment to PHA; and the total monthly principal and interest installments under these contracts equaled the monthly principal and interest payments to PHA under the mortgage. In detail, these figures were as follows:

LAKE FOREST, INC.
WILMINGTON, N.C.

PAYMENTS BY MEMBERS UNDER MUTUAL OWNERSHIP CONTRACTS

| Number of units | Type of units | Purchase price of perpetual use | | Cash down-payment | | Balance of purchase price | | Monthly principal and interest payments | |
|---|---|---|---|---|---|---|---|---|---|
| | | Each unit | Total | Each unit | Total | Each unit | Total | Each unit | Total |
| 86 | 3 rooms | $2,804 | $241,144 | $140.20 | $12,057.20 | $2,663.80 | $229,086.80 | $13.34 | $1,147.24 |
| 350 | 4 rooms | 3,011 | 1,053,850 | 150.55 | 52,692.50 | 2,860.45 | 1,001,157.50 | 14.32 | 5,012.00 |
| 148 | 5 rooms | 3,392 | 502,016 | 169.60 | 25,100.80 | 3,222.40 | 476,915.20 | 16.13 | 2,387.24 |
| 584 | | | 1,797,010 | | 89,850.50 | | 1,707,159.50 | | 8,546.48 |

PAYMENTS BY CORPORATION TO PUBLIC HOUSING ADMINISTRATION

| Purchase price of entire property | Cash down-payment | Balance of purchase price (amount of mortgage) | Monthly principal and interest payments |
|---|---|---|---|
| $1,797,000 | $89,850 | $1,707,150 | $8,546.40 |

So far as practicable, petitioner should sell the perpetual use of a dwelling after April 1, 1948, at the original assigned price less a stated, fixed monthly reduction in value, but petitioner could sell at a lower or higher figure. In addition to the mortgage principal and interest payments petitioner should pay each month to PHA one-it failed to maintain its status as a nonprofit mutual ownership twelfth of the year's taxes, assessments, insurance premiums, and water rates.

The mortgage note provided that petitioner would be in default if housing corporation under North Carolina law, amended its charter or bylaws without PHA consent, failed to make the payments required by the mortgage, or violated any of its covenants in the mortgage. The form of mutual ownership contract and a statement of eligibility standards for occupancy, giving perference to veterans and servicemen, then to tenants occupying the project on March 7, 1947, and then to "other eligible tenants," were made a part of the mortgage.

In the fall of 1954, petitioner's certificate of incorporation, bylaws, and mutual ownership contracts were amended, with PHA approval, to make clearer and more specific the nonprofit nature of petitioner's organization, operation, and agency relationship with its members, and to provide for issuance of certificates of indebtedness and book credits to members under certain conditions. Insofar as relevant here, the amendments to the certificate were as follows:

THIRD: The objects and purposes for which this nonprofit, civic league, corporation is formed are as follows:

(a) To purchase * * * [Lake Forest], and to provide low and medium cost housing and desirable water and power and other facilities to veterans of world wars and to their families and to others who can qualify for participating membership in this corporation according to the requirements and procedures which may be provided in the by-laws. All rights of members in and to housing and to the reasonable necessary appurtenances, and to equipment, fixtures, supplies, facilities and services, including community parks, playgrounds, and meeting and recreation structures and other community facilities and services and to unimproved lands of this corporation are to be provided to members and their families and to short term tenants of members as allowed by by-law regulations, at cost, so that this corporation shall at all times in its property holdings and its contract relations be and act as a non-profit agent of its members.

(b) To assist veterans of world wars and others who qualify for and are granted membership to acquire rights of perpetual use and a conditional option of ultimate ownership of a dwelling unit and its easements and appurtenances at * * * [Lake Forest] ; and to construct, and furnish to members at cost to them, residences on the sites of said projects or on other lands that the corporation may acquire for said purposes, and to provide for, and to contract with members by, mutual ownership contracts which shall set forth the details of non-profit agent duties of operation of this corporation by which perpetual use rights to dwelling units and their easements and other appurtenances and fixtures and all other allocated property rights and interests of members are to be accomplished under this certificate of incorporation and the by-laws of this incorporated association, compatible with its obligations to the Public Housing Administration.

(c) To fix originally the price of the rights of perpetual use and ultimate acquisition of all dwelling units and their easements and appurtenances, which price shall also pay for the rights of members in and to community improvements and facilities and unimproved lands and other assets not appurtenant to the respective assigned dwellings units, * * * at an originally assigned price which with stipulated interest will pay off all mortgage debt to the Federal Public Housing Authority, now the Public Housing Administration, and its successor, according to the terms of said mortgage ; to accumulate members' allocated capital reserves in order to comply with said Public Housing Administration mortgage and in order to carry out other corporate purposes; and to levy additional monthly charges against its members to cover expenses of using, maintaining and operating said projects and to provide an allocated capital fund for making other capital improvements or additions or acquiring real or personal property for corporate purposes.

FOURTH : This non-profit, civic league corporation shall have the following powers, which must always be exercised only as a non-profit agent :

(a) To engage in the activity of, and in all activities in connection with, the purchase and acquisition of land and easements and appurtenances thereto in North Carolina, and of the financing and of the erection thereon, and the improvement, remodeling, reconstruction, demounting, moving, transport, reerection, repair, maintenance, renovation and management and operation of low and medium-cost housing and of community buildings, recreation grounds, facilities and services for the mutual benefit of its members. The corporation shall have power to acquire, construct, maintain and improve and administer rights of way, and mutual water rights, and to sell membership perpetual uses in particular dwellings with their appurtenances and perpetual uses in common to all other property and property rights of every kind held by the corporation.

(b) To borrow money * * * to issue notes, bonds * * * certificates of indebtedness * * * to insure all buildings * * * in which it has an interest.

\*        \*        \*        \*        \*        \*        \*

(d) To enter into all necessary or proper contracts for the furthering of the purposes and objects of the corporation, including the making of mutual ownership contracts for the acquisition by members of perpetual possession and use rights in, and of accumulating contractual values in regard to designated dwelling units and land and water rights in connection therewith, and ultimate acquisition rights thereto, and granting also the right to each member to transfer his said rights of perpetual possession and ultimate acquisition to the dwelling unit and appurtenances designated in his mutual ownership contract * * *.

(e) To acquire and plat lands for low, or medium-cost housing and to finance and to erect on a cost basis, dwelling units, apartments, garages, community service buildings and playgrounds; and to erect, improve, maintain, renovate, recondition, and remodel, operate and manage all dwelling units, apartments, garages, community service buildings, playgrounds, mutual water rights, culinary water rights, and all rights of way and to acquire at cost to its members all personal property reasonably necessary to the convenient use of the foregoing lands, buildings, facilities and rights by the members or through them to their short term tenants.

(f) To determine by appropriate by-laws the requirements, and priorities, if any, of eligibility for membership and to enter into mutual ownership contracts with members, which shall be satisfactory to the Public Housing Commissioner and his successor so long as the mortgage debt of this civic league, non-profit corporation to the United States of America acting by and through the Public Housing Administration shall remain unpaid.

(g) To furnish a meeting hall, recreational facilities, parks, playgrounds, streets, sidewalks, sewer systems and all facilities deemed needful or desirable for the good of the members and their families, and lessees of members and their families, and others who may use the community facilities including the parks and playgrounds of the corporation.

\*        \*        \*        \*        \*        \*        \*

(i) To set up cost reserves including reserves required by law, if any. and reserves required by the United States of America acting through the public Housing Administration to insure the payment to it of the mortgage debt owing to it by the corporation; and including also valuation reserves for depreciation, replacement, repair, alteration, remodeling, redecorating, renovation and vacancy and collection less reserves, and any and all proper costs and valuation reserves in connection with the operation of a non-profit housing corporation. All reserves in excess of annual needs shall be and remain, and be allocated as, loans from members to the corporation, and the same shall be allocated and constructively distributed annually to the members entitled thereto in noticed book credits, and may be distributed in certificates of indebtedness, and the manner of allocation and constructive distribution thereof shall be as may be provided in the by-laws.

\*        \*        \*        \*        \*        \*        \*

(k) To determine, charge and collect from members monthly or other periodic operating charges required for the operating expenses of the corporation and for maintaining reasonable expense, loss and valuation reserves; and all such charges in excess of annual needs and expenses shall be allocated and constructively distributed annually to members in the form of book credits or otherwise.

(1) To issue certificates of indebtedness for the purpose of assisting members in the financing of purchases and acquisitions of rights of perpetual use and ulti-

mate acquisition, and other interests in the corporation, from members or former members, and for the purpose of acquiring lands and erecting thereon low or medium cost dwelling units, and for other corporate purposes. These certificates may be in annual series or otherwise, and may be interest bearing or non-interest bearing as determined by the by-laws or by the action of the membership of the corporation, and shall be in such form and for such term as the Board of Directors shall determine. These certificates shall be subordinate to the claims of lien and general creditors of the corporation.

The foregoing particular powers shall not be considered as limitations but the corporation shall have full power to do any and all things that are or may be necessary, convenient or desirable to accomplish the foregoing objects and purposes and to carry into effect the foregoing powers as fully as any non-profit building, housing and community service corporation could do, but always acting only as a gratuitous agent of its members.

\* \* \* \* \* \* \*

NINTH : The period of existence of this corporation shall be unlimited.

TENTH : Upon the dissolution of this mutual corporation the secured and general creditors shall first be paid in full. Second, there shall be conveyed to the members their respective dwellings, proper and necessary real estate allocable to each dwelling and all appurtenances thereto. If any members have not paid in full their monthly perpetual use and ultimate acquisition charges, proper adjustments for such delinquencies shall be made in final distribution, so that the members shall receive their fair and equitable pro rata interests in the distributable assets of the corporation. Third, the members shall be entitled to the return of their membership fees, without dividends or interest. Fourth, all book credit loans, whether noticed or not, and all certificates of indebtedness shall fall due by reason of dissolution and the holders of such book credits and certificates shall receive principal in full and interest, if any, due thereon.

All community buildings with appurtenances and all parks and playgrounds shall be conveyed to a successor non-profit corporation or to a municipal corporation or to some eleemosynary corporation, or otherwise disposed of, as may be determined by the majority vote of the membership.

If any other assets remain in the corporation they shall be distributed to all members in proportion to the respective total amounts of ultimate acquistion payments made by them and their predecessors in interest and the book credits, certificates of indebtedness and other loans or capital contributions to or investments in the corporation.

Any payments or distributions on dissolution may be made in cash or in property in the discretion of the Board of Directors.

ELEVENTH : This corporation is not organized for profit and no capital stock is required nor shall any capital stock be issued, and admission to, and termination of membership in the corporation shall be regulated by its by-laws and no member shall be liable for the debts of the corporation by reason of his membership.

In short, the primary purposes of these amendments to the bylaws and corporate charter as they pertain to the issues in this case were as follows:

Petitioner was authorized and required to allocate and constructively distribute annually to its members book credits in the amount by which operating collections and charges exceeded operating expenses and needs;

Petitioner was authorized and required to allocate and constructively distribute annually to its members book credits in the amount of additions to two reserve accounts. The first reserve account was for repairs, maintenance, and replacement costs; the second reserve account was for vacancy and collection losses;

Petitioner revised its designation of distributees upon liquidation to provide that, first, creditors would be paid in full; second, members would be conveyed their respective dwellings and appurtenances; third, members would receive a return of their membership fees; fourth, members would receive their book credits; fifth, all remaining real estate would be conveyed to a successor nonprofit corporation or to a municipal corporation or some eleemosynary corporation or otherwise disposed of as determined by petitioner's membership; and, finally, any remaining assets would be distributed among the members themselves.

From its inception and during the years involved herein petitioner has operated and conducted its affairs in substantial compliance with its certificate of incorporation and bylaws, its purchase and sale contract with and mortgage to the PHA, its mutual ownership contracts with its members, the directives of the PHA, and the requirements of law, all as amended from time to time. It has maintained its status and has operated as a nonprofit mutual or cooperative ownership housing corporation. Permanent occupancy of the dwellings owned by it has been restricted to petitioner's members under mutual ownership contracts although for part of the years 1949 and 1950, 43 of the smaller units were rented under 30-day leases to nonmembers because of vacancies. Petitioner has owned no real property other than the Lake Forest project and has conducted no operations or activities outside of New Hanover County, North Carolina. It has filled a definite need in the community by providing adequate housing and living conditions for its members at low cost and has furnished all utilities and services to members in connection therewith at its cost, although it has set up certain reserve accounts and funds as herein described. It has made available to its members community facilities such as streets, sidewalks, bus stops, playgrounds, parks, a meeting and recreation hall, library, nursery school, and other facilities, either without charge or at cost, and has permitted citizens of Wilmington generally the use of such facilities either without charge or at cost. It has encouraged home ownership, thrift, and proper maintenance and care of dwellings and grounds.

The monthly operating payments made by petitioner's members to it have been determined each year upon the basis of an annual budget which has been prepared by petitioner in the light of the preceding year's financial experience. Each annual budget has been

submitted to and approved by the PHA. No dividends or distributions have been made to members other than payments to departing members of their equities in the mutual ownership contracts and the corporation, nor have members been entitled to any such dividends or distributions.

Petitioner's organization and operations from the beginning have been subject to extensive control and direction by the PHA as provided for in the mortgage, purchase contract, and certificate of incorporation, and this control and direction will continue so long as PHA has a financial interest in the project. One of the five members of petitioner's board of directors was a PHA officer, employee, or representative. This representation continued until November 1952 when the requirement was voluntarily waived by PHA. Petitioner could not amend its certificate, bylaws, or regulations without PHA permission. PHA prescribed the form of application for membership and the form and terms of the mutual ownership contract, and prohibited lease or disposition of any interest in the project property except by means of mutual ownership contracts or by leasing dwellings on which such contracts were not outstanding. Petitioner could not dispose of obsolete or junk equipment without PHA permission. Petitioner's income and expenses were controlled by the annual budget submitted to PHA for approval. PHA established the prices of perpetual uses of dwellings and the terms of payment therefor, and set forth the manner of petitioner's operation as a nonprofit mutual membership housing corporation. The amounts of property insurance, the insurance companies, the monthly payments into the reserve for replacement, the monthly deposit for taxes, assessments, insurance premiums, and water rates, the books and records to be kept by petitioner, and the bank or banks in which petitioner should deposit its funds were determined or approved by PHA. PHA representatives inspected the project from time to time to see that petitioner was keeping it in good repair and condition, as required. PHA decided what information and reports should be furnished by petitioner; petitioner regularly supplied copies of all minutes, financial statements and audit reports, and other information upon request.

By the terms of the purchase contract and the mutual ownership contracts the price at which petitioner sold or a member resold the perpetual use of a dwelling was restricted to the original price so long as Federal rent control was in force. The member who occupies a dwelling under a mutual ownership contract continues to pay monthly operating payments to petitioner after he completes payment of the price of his perpetual use. During the years in question the monthly operating payment made by each member has been almost twice the size of his monthly perpetual use or "principal" payment.

The principal payments made by members under their mutual ownership contracts with petitioner were the amounts necessary to liquidate petitioner's principal indebtedness to the United States and were applied each year by petitioner to the payment of its mortgage indebtedness. For the period April 1, 1948, through December 31, 1948, the original downpayments by members and their entire principal payments under their contracts were credited on petitioner's books to an account entitled "Members' Equities" and were so shown on its financial statements. These principal payments were excluded by petitioner from gross income on its income tax returns for such period. For the period January 1, 1949, through June 30, 1955, petitioner credited annually to members' equities and excluded from gross income a portion only of members' principal payments, i.e., the principal payments less a fixed reduction for dwelling depreciation in value.[1]

As of September 30, 1954, members' equities totaled $166,718.49; pursuant to amendments to the certificate and bylaws, effective October 1, 1954, this account was increased to $305,968.45 by adding back the depreciation reduction for prior years and adjusting the account to equal total individual member's equity accounts as established by inventory. However, no attempt was made to increase retroactively by such adjustments the principal payments excluded from gross income in these years.

For the fiscal year ended June 30, 1956, all principal payments made by members under their mutual ownership contracts were credited, without any reduction for depreciation, to members' equities and were excluded by petitioner from gross income on its tax return for this fiscal year.

Petitioner's members were advised of their principal payments and accumulated equities by published schedules and individual member's equity records. These published schedules and individual records were used to show each member how the principal balance due under his mutual ownership contract gradually declined over the 25-year payment period, and how his "net equity" in the perpetual use of the unit and in the corporation itself built up over the years.

These schedules and individual records were also used as the basis of cash payments by petitioner to departing members for their equities and interests as hereinafter described.

The original mutual ownership contract, in effect until September 30, 1954, gave petitioner the option to repurchase the right of perpetual use from a member who wished to leave the project, and in all cases, except intrafamily transfers, petitioner repurchased such

---

[1] This fixed depreciation figure has no direct connection with the depreciation shown on petitioner's tax returns.

rights and transferred them to an old or new member desiring the use of the particular dwelling, under a new mutual ownership contract.

Under the amended mutual ownership contract, used after October 1, 1954, petitioner had no option to repurchase unless the member transferred his rights to a person not approved for membership, but petitioner as gratuitous agent agreed to assist members in selling their rights and new members in financing their purchases, in accordance with the bylaws. In practice, members have continued to handle transfers through the corporation.

The handling of these transfers has varied in four different periods during the years here involved. In the first period, April 1, 1948, through December 31, 1948, petitioner repaid the selling member in cash his downpayment and all principal payments under his mutual ownership contract,[2] and the purchasing member paid petitioner cash in the same amount. In effect, the new member simply took over the old member's rights, although a new mutual ownership contract was issued to him.

Petitioner soon realized that the increased cash outlay required of new members was adversely affecting its membership and full occupancy of the project. After January 1, 1949, petitioner reduced the amount paid the selling member by a fixed monthly depreciation in value, based on depreciation of the buildings and equipment over a period of 40 years. The resulting amount paid the selling member, i.e., his downpayment and accumulated principal payments less the depreciation, was termed his "net equity." During the calendar year 1949, the purchasing member paid in cash the same "net equity" which petitioner paid the selling member.

The problem of vacancies again forced a reduction in the cash required of new members. From January 1, 1950, to October 1, 1954, the new member paid only the original downpayment in cash, and agreed to pay petitioner the balance of the purchase price of his perpetual use over a 25-year period. The outgoing member continued to receive his net equity in cash. The cash difference was made up by petitioner out of its monthly operating payments from members.

From October 1, 1954, to June 30, 1956, petitioner was authorized and required by its amended charter and bylaws to give each departing member cash for his net equity and a certificate of indebtedness, equaling in amount the assigned depreciation, for the difference between such equity and his total principal payments. The amount of these certificates of indebtedness is shown on petitioner's books and financial statements, but the certificates have not been issued because

---

[2] The cash actually received by the selling member in all four periods was reduced by any current account owed by him to petitioner and by the cost of repainting and repairing the interior of the dwelling, as required by the mutual ownership contract.

PHA has not consented to such issuance. During this 1954–1956 period the incoming members continued to pay in cash only the original downpayments.

The principal payments received by petitioner from its members each year have totaled less than the principal payments made by petitioner to PHA on the mortgage. The difference arises out of the turnover in petitioner's membership and the treatment of incoming members. All members in the same size unit make, in total amount, identical monthly principal and interest payments, but the more recent members pay more interest and less principal than the original members. The equivalence in members' principal payments and petitioner's principal payments embodied in the mortgage assumed that new members would simply take over old member's contracts and payments.

The following schedule shows the principal payments made by members to petitioner excluded from income, and their reconciliation with unreported income from this source as set forth in respondent's statutory notices of deficiencies, as amended:

| Period | Excluded principal payments | Certificates of indebtedness to departing members | Cost of repurchasing units | Investment in unsold units | Unreported income per statutory notices |
|---|---|---|---|---|---|
| Apr. 1, 1948, to June 30, 1948 | $12,218.64 | | $375.82 | ($302.00) | $12,144.82 |
| Fiscal year ended June 30— | | | | | |
| 1949 | 36,287.60 | | 4,297.40 | (217.08) | 32,207.28 |
| 1950 | 20,880.62 | | 13,566.11 | 217.08 | 7,097.43 |
| 1951 | 10,245.36 | | 1,307.61 | | 8,937.75 |
| 1952 | 11,900.16 | | 10,926.51 | (1,215.00) | 2,188.65 |
| 1953 | 13,684.80 | | 6,777.98 | 1,215.00 | 5,691.82 |
| 1954 | 15,487.20 | | 10,655.70 | | 4,831.50 |
| 3 months ended Sept. 30, 1954 | 4,331.04 | | 3,230.30 | | 1,100.74 |
| 9 months ended June 30, 1955 | 12,347.21 | | 8,257.10 | | [1] 4,090.11 |
| Fiscal year ended June 30, 1956 | 49,873.54 | $28,238.57 | 12,924.92 | | [1] 8,710.05 |

[1] Added to petitioner's unreported gross income by means of an amendment filed by respondent.

Petitioner paid the following amounts to PHA on its principal mortgage indebtedness during the years in question as follows:

| Period or fiscal year ended— | Amount | Period or fiscal year ended— | Amount |
|---|---|---|---|
| Apr. 1, 1948, to June 30, 1948 | $7,144.83 | June 30, 1953 | $50,467.35 |
| June 30, 1949 | 44,902.45 | June 30, 1954 | 52,262.30 |
| June 30, 1950 | 47,494.37 | June 30, 1955 | 54,121.10 |
| June 30, 1951 | 47,040.34 | June 30, 1956 | 56,025.59 |
| June 30, 1952 | 49,312.61 | | |

In the deficiency notices, respondent excluded these amounts from petitioner's income for the years in which they were paid.

During all the years in question substantially more than 90 percent of petitioner's gross income has been attributable to monthly operating and principal payments by members.

The rights of members upon any dissolution of petitioner were determined by their individual equities arising out of their principal payments. The members' equities account represents the capital of petitioner as a nonstock, membership corporation.

In 1948, approximately 68 percent of petitioner's members were veterans. In 1956, approximately 54 percent of petitioner's members were veterans. Since 1951 petitioner has had a waiting list for all size units.

By letters dated June 26, 1956, and November 15, 1956, petitioner advised its membership of the amounts of their book credits authorized by the amendments in the fall of 1954 to the certificate and by-laws for the 9 months ended June 30, 1955, and the fiscal year ended June 30, 1956. These letters further stated, *inter alia*:

Under the amended charter and by-laws of Lake Forest, Inc., all monthly payments made by members since October 1, 1954 have been made with the understanding and obligation on the part of the corporation that all amounts not actually paid out by the corporation on the government mortgage and for operating expenses would be treated as loans from members, for which they would be given credit on the books at the end of the corporation's fiscal year. This includes each member's share of the year's additions to the reserves which the corporation is required to maintain, principally the reserve for repairs, maintenance and replacement, and a reserve for vacancy and collection losses, and also each member's share of any excess of operating income over expenses.

*     *     *     *     *     *     *

None of these book credits are payable by the corporation on any fixed date, and no part of them can be paid in cash until after the government mortgage is completely liquidated. Furthermore, the reserve for repairs, maintenance and replacements and the reserve for vacancy and collection losses were established for the purpose of protecting the corporation against heavy expenditures and losses from these causes, and your Board of Directors fully expects that these reserves will have to be used at some time in the future for the purposes for which they were created. If such is the case, an assessment against the members, payable by cancelling part of each member's book credits, will be made, and your book credits shown will be reduced accordingly.

Of course, the amounts of your book credits do not include the equity you have accumulated in your dwelling unit by reason of the principal payments under your mutual ownership contract. You can determine this equity at any time by referring to the schedule applicable to your particular size unit.

The book credits, after adjustments, arising out of operations, or the excess of revenues over expenditures, were in the amounts of $36,685.20 for the 9 months ended June 30, 1955, and $23,673.61 for the year ended June 30, 1956. The unreserved surplus balance on petitioner's books arising from operations for the period from April 1, 1948, through September 30, 1954, credited on petitioner's books to its membership as of October 1, 1954, was in the amount of $42,598.25.

The book credits arising out of additions to the two funded reserve accounts, for repairs, maintenance, and replacements, and for vacancy and collection losses, after reductions for charges to those reserves,

were in the net amounts of $16,390.70 for the 9 months ended June 30, 1955, and $23,992.50 for the year 1956. The balance in these reserves as of September 30, 1954, credited on petitioner's books to its membership as of October 1, 1954, in accordance with the amendments, was in the amount of $128,869.87. These two funded reserves were deposited in a bank in Wilmington, and invested in United States Government bonds, in accordance with the mortgage requirements; the amounts of these reserves were determined by a formula prescribed by the mortgage.

For the years 1955 and 1956 petitioner included in its expenses and deducted from income the following amounts which entered into the computation of the book credits mentioned above:

| Year | Repairs, replacement, maintenance | Vacancies and collection loss | Excessive operating collections |
|---|---|---|---|
| 1955 | $10,657.91 | $10,634.76 | $34,403.11 |
| 1956 | 12,781.02 | 12,739.41 | 31,834.58 |

Respondent, in his statutory notices of deficiencies, determined that such amounts were neither deductible nor excludible from petitioner's income for the years 1955 and 1956.

On its Form 1120 returns for the years here involved except for the 9 months ended June 30, 1955, and the year 1956, petitioner deducted depreciation on its residential buildings, and the stoves, refrigerators, heaters, and electric and gas meters used in connection therewith for the years and in the amounts as follows:

| Period or fiscal year ended— | Amount | Period or fiscal year ended— | Amount |
|---|---|---|---|
| Apr. 1, 1948, to June 30, 1948 | $15,247.08 | June 30, 1952 | $60,623.53 |
| June 30, 1949 | 61,226.07 | June 30, 1953 | 60,501.04 |
| June 30, 1950 | 61,212.35 | June 30, 1954 | 50,299.63 |
| June 30, 1951 | 60,712.15 | July 1, 1954, to Sept. 30, 1954 | 9,222.22 |

Such deductions were disallowed by respondent.

For the 9 months ended June 30, 1955, and the year 1956, petitioner included depreciation on its residential buildings and equipment in its operating expenses used in computing its net operating income. However, it did not use the depreciation as such as a deduction item in computing net operating income because of the manner in which the "excessive membership collections distributable as book credits" (hereinafter referred to as "excessive collections") were computed and used in arriving at net operating income during these periods. To compute these excessive collections depreciation was first subtracted from total expenses. This reduced expense figure was then subtracted from total operating revenues to arrive at the amount of the excessive collections. In computing net operating income, the excessive collections less depreciation were added to the total expenses; the re-

sulting figure was subtracted from total operating revenues, resulting in a net operating income of zero. This method of computing and using the excessive collections as a deduction would always result in a net operating income of zero, regardless of whether total operating revenues were more or less than operating expenses. The reported income for these periods resulted from other miscellaneous income. In effect, respondent, in disallowing the excessive collections as deductions, disallowed deductions for depreciation to the extent that the amount of the excessive collections approached the amount of the depreciation included as part of net operating expenses. Respondent did not disallow deductions for any greater amount of depreciation than the amounts of the excessive collections because no deductions greater in amount than such collections were claimed. For the 9 months ending June 30, 1955, and the year 1956, these figures and computations were as follows:

| Computation of excessive collections: | 9-month period ended June 30, 1955 | | Fiscal year ended June 30, 1956 |
|---|---|---|---|
| Total operating expenses (includes depreciation) | $219,332.48 | | $287,858.54 |
| Less: Depreciation | 29,034.08 | | 37,743.54 |
| Expense figure | 190,298.40 | | 250,115.00 |
| Operating revenues from members | 224,701.51 | | 281,949.58 |
| Less: Expense figure | 190,298.40 | | 250,115.00 |
| Excessive collections | 34,403.11 | | 31,834.58 |
| Computation of net operating income: | | | |
| Operating revenues from members | 224,701.51 | | 281,949.58 |
| Less: | | | |
| Operating expenses _____ $219,332.48 | | $287,858.54 | |
| Excessive collections ___ 34,403.11 | | 31,834.58 | |
| | 253,735.59 | 319,693.12 | |
| Less: Depreciation ____ 29,034.08 | | 37,743.54 | |
| Deducted operating expenses | 224,701.51 | | 281,949.58 |
| Net operating income | _____ | | _____ |

Petitioner also deducted depreciation on its office and maintenance buildings, vehicles, equipment, and similar property. These deductions were allowed by respondent.

All of the above-mentioned property was subject to wear and tear, exhaustion, and obsolescence and had a limited determinable existence. The depreciation rates used were reasonable. The depreciation was based on the ultimate cost of the property to petitioner.

Besides its original cost, petitioner spent substantial amounts on repairs, maintenance, and replacements of the property and suffered

economic loss as a result of the gradual exhaustion of its usefulness and the decline in its value.

Pursuant to the mortgage and ownership contracts petitioner paid property taxes on the property, including the dwellings, and insured them in its name against loss by fire and other casualties. Petitioner's members were advised annually of their pro rata shares of the property taxes paid by the corporation, and they deducted their shares of these taxes on their personal income tax returns.

Petitioner's income tax returns and attached schedules filed for the period from April 1, 1947, to June 30, 1948, and for the subsequent years in question disclosed gross income, expenses, and net income or loss, before income taxes and adjustments for net operating loss carryovers and carrybacks, in the following amounts:

| Year | Gross income | Expenses | Net income (loss) |
|------|-------------|----------|-------------------|
| 1948 | $72,029.08 | $76,556.02 | [3] ($4,526.94) |
| 1949 | 268,761.33 | 288,369.65 | (19,608.38) |
| 1950 | 288,925.51 | 273,958.00 | 14,967.51 |
| 1951 | 288,318.19 | 294,333.31 | (6,015.12) |
| 1952 | 300,049.96 | 284,320.00 | 15,147.06 |
| 1953 | 299,359.64 | 280,531.05 | [4] 18,828.59 |
| 1954 | 300,452.13 | 305,961.17 | [5] (5,509.04) |
| 1955 | 320,327.00 | 303,696.45 | 16,630.55 |
| 1956 | 286,834.86 | 281,949.58 | [6] 4,885.28 |

Petitioner's assets, liabilities, deficit or surplus, according to its balance sheets filed with its income tax returns, as of June 30, 1948, July 1, 1955, and June 30, 1956, were as follows:

ASSETS

*June 30, 1948*

Current assets:

Cash_____ $27,655.37

Accounts receivable_____ 1,933.41

Stores inventory_____ 926.05

Equity in unsold units_____ 375.82

Prepaid insurance_____ 2,553.07

Deposits with FPHA_____ 8,908.98

Total current assets_____ 42,352.70

Fixed assets—schedule_____ $1,810,131.49

Less: Reserve for depreciation—schedule____ 15,294.88   1,794,836.61

Total assets_____ 1,837,189.31

[3] For this period petitioner also claimed a "Loss on operation as agent for Federal Public Housing Authority" in the amount of $5,540.09, and claimed a loss for the entire period in the amount of $10,067.03.

[4] Adjusted to $21,889.84 for purposes of Federal income tax liability by reason of adjustments to interest expense and State income tax.

[5] Adjusted to a net income of $26,953.98, by adding to income State and Federal income taxes in the amount of $10,145.52, "reserves" in the amount of $24,397.17, and deducting an expense item and the current year's State income taxes in the amounts of $450.22 and $1,629.35, respectively.

[6] Adjusted to $4,727.67 by a deduction of State income taxes in the amount of $157.61.

## LIABILITIES

Current liabilities:

| | |
|---|---:|
| Accounts payable | $13,523.81 |
| Prepaid rent | 2,394.54 |
| Notes payable | 9,000.00 |
| Taxes payable and accrued | 18,865.05 |
| Tenants' security deposits | 40.00 |
| Total current liabilities | 43,823.40 |
| Mortgage payable | 1,700,005.17 |
| | 1,743,828.57 |

Other liabilities and reserves:

| | | |
|---|---:|---:|
| Members' equities | $103,481.77 | |
| Reserve for repairs, maintenance, and replacements | 529.99 | |
| Reserve for vacancy and collection losses | 3,108.49 | |
| | | 107,120.25 |

Surplus (or deficit):

| | | | |
|---|---:|---:|---:|
| Net loss for fiscal year | | (10,067.03) | |
| Add: Organization expense | ($54.00) | | |
| Expenses set up in contingency reserves | (3,638.48) | (3,692.48) | (13,759.51) |
| Total liabilities | | | 1,837,189.31 |

## ASSETS

*July 1, 1955*

| | | |
|---|---:|---:|
| Cash | | 90,129.99 |
| Notes and accounts receivable: | | |
| Less: Bad debt reserve | | 6,942.69 |
| Inventories | | 6,483.10 |
| Investments: | | |
| U.S. Government bonds | 83,769.00 | 83,769.00 |
| Total depreciable assets | 1,523,851.77 | |
| Less: Depreciation reserve | (320,740.70) | 1,203,111.07 |
| Land | | 207,347.83 |
| Investment in unsold units | 272.00 | |
| Prepaid expenses | 22,736.26 | 23,008.26 |
| Total assets | | 1,620,791.94 |

## LIABILITIES

| | | |
|---|---:|---:|
| Accounts payable | | 12,793.60 |
| Mortgages payable | | 1,354,404.65 |
| Certificates of indebtedness | 17,795.65 | |
| Membership fees refundable | 770.00 | 18,565.65 |
| Taxes | | 25,256.27 |
| Other liabilities: | | |
| Reserves for repairs, maintenance, and replacements | 80,617.39 | |
| Reserve for vacancy and collection losses | 64,643.18 | |
| Members' equities | 305,968.45 | 451,229.02 |

| | | |
|---|---|---|
| Members' book credits arising from operations___ | $79,283.45 | $79,283.45 |
| (Deficit) from accumulated depreciation_____ | | (320,740.70) |
| Total liabilities_____ | | 1,620,791.94 |

*June 30, 1956*  **ASSETS**

| | | |
|---|---|---|
| Cash_____ | | 118,388.20 |
| Notes and accounts receivable: | | |
| Less: Bad debt reserve_____ | | 13,639.99 |
| Inventories_____ | | 6,641.40 |
| U.S. Government bonds_____ | | 86,027.50 |
| Total depreciable assets_____ | 1,512.850.45 | |
| Less: Depreciation reserve_____ | (347,046.30) | |
| | | 1,165,804.15 |
| Land_____ | | 207,347.83 |
| Investment in unsold units_____ | 1,103.00 | |
| Prepaid expenses_____ | 16,263.94 | 17,366.94 |
| Total assets_____ | | 1,615,216.01 |

**LIABILITIES**

| | | |
|---|---|---|
| Accounts payable_____ | | 17,810.58 |
| Mortgages payable_____ | | 1,298,379.06 |
| Certificates of indebtedness_____ | 46,034.22 | |
| Membership fees refundable_____ | 1,290.00 | |
| | | 47,324.22 |
| Taxes_____ | | 11,859.82 |
| Other liabilities: | | |
| Reserves for repairs, maintenance, and replacements_____ | 91,870.48 | |
| Reserve for vacancy and collection losses___ | 77,382.59 | |
| Members' equities_____ | 314,678.50 | |
| | | 483,931.57 |
| Members' book credits arising from operations_____ | | 102,957.06 |
| (Deficit) from accumulated depreciation_____ | | (347,046.30) |
| Total liabilities_____ | | 1,615,216.01 |

Petitioner submitted to respondent or his representatives proper application for exemption from taxation under section 101 of the Internal Revenue Code of 1939, as amended, and filed timely verified returns on Treasury Department Form 990 with the district director of internal revenue, Greensboro, North Carolina, for the fiscal years ended June 30, 1948, 1949, and 1950.

By letter to petitioner dated July 19, 1951, respondent's office stated that in its opinion,

based upon the evidence presented, that for the period from the date of your incorporation, February 6, 1947, to March 31, 1948, inclusive, when you operated the housing projects as an agency of the United States Government you are entitled to exemption from Federal income tax under the provisions of section 101(8) of the Internal Revenue Code as an "organization not organized for profit but operated exclusively for the promotion of social welfare."

It is further the opinion of this office, based upon the evidence presented, that beginning April 1, 1948, the date on which you assumed ownership of the housing projects and began operating them as your own business, you have been merely providing on a cooperative plan housing facilities for your members which are for their personal benefit. It is held, therefore, that beginning April 1, 1948, you are not entitled to exemption from Federal income tax under the provisions of section 101(8) of the Internal Revenue Code. You are required, therefore, to file income tax returns on Form 1120 beginning April 1, 1948.

Pursuant to respondent's instructions, petitioner filed timely verified returns on Form 1120 for the fiscal years ended June 30, 1948 through 1956, and paid income taxes for said years in the total amount of $19,690.37.

OPINION.

Petitioner contends that providing low-rent housing for its members and others without profit is the promotion of social welfare within the meaning of section 101(8) of the Internal Revenue Code of 1939 (sec. 501(c)(4), I.R.C. 1954) and qualifies it for exemption pursuant to these sections.[7]  *Scofield* v. *Rio Farms, Inc.*, 205 F. 2d 68 (C.A. 5, 1953), affirming 103 F. Supp. 515 (W. D. Tex. 1952); *United States* v. *Pickwick Electric Membership Corp.*, 158 F. 2d 272 (C.A. 6, 1946); *Debs Memorial Radio Fund* v. *Commissioner*, 148 F. 2d 948 (C.A. 2,

---

[7] Section 501(c)(4) applies to years beginning after December 31, 1953. The two sections are identical and are hereinafter referred to simply as sec. 501(c)(4).

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a), shall be exempt from taxation * * *.

* * * * * *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

* * * * * *

(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

Section 39.101(8)–1, Regs. 118, applicable to section 101(8), I.R.C. 1939, for years beginning after December 31, 1951, reads as follows:

"* * * *Civic leagues and local associations of employees.* Civic leagues entitled to exemption under section 101(8) comprise those not organized for profit but operated exclusively for purposes beneficial to the community as a whole, and, in general, include organizations engaged in promoting the welfare of mankind, * * *"

Section 29.101(8)–1, Regs. 111, was identical to the corresponding provision in Regs. 118.

Section 1.501(c)(4)–1, Income Tax Regs., applicable to the 1954 Code reads as follows: * * * CIVIC ORGANIZATIONS AND LOCAL ASSOCIATIONS OF EMPLOYEES.—(a) *Civic organizations*—(1). *In general.* A civic league or organization may be exempt as an organization described in section 501(c)(4) if:

(i) It is not organized or operated for profit; and

(ii) It is operated exclusively for the promotion of social welfare.

(2) *Promotion of social welfare*—(i) *In general.* An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements. * * *

* * * Nor is an organization operated primarily for the promotion of social welfare if its primary activity is operating a social club for the benefit, pleasure, or recreation of its members, or is carrying on a business with the general public in a manner similar to organizations which are operated for profit. * * *

1945), reversing 3 T.C. 949 (1944) ; *Hanover Imp. Soc.* v. *Gagne*, 92 F. 2d 888 (C.A. 1, 1937) ; *Garden Homes Co.* v. *Commissioner*, 64 F. 2d 593 (C.A. 7, 1933), reversing 26 B.T.A. 441 (1932) ; Rev. Rul. 55–439, 1955–2 C.B. 257.

Respondent contends that petitioner is simply engaged in providing personal economic benefit to its membership by providing them with low-cost housing, and that this is not the promotion of social welfare. *Consumer-Farmer Milk Cooperative, Inc.*, 13 T.C. 150 (1949), affd. 186 F. 2d 68 (C.A. 2, 1950).

We agree with petitioner.

To be entitled to exemption pursuant to section 501(c) (4), a civic league organization must be "not organized for profit but operated exclusively for the promotion of social welfare." *United States* v. *Pickwick Electric Membership Corp.* and *Hanover Imp. Soc.* v. *Gagne*, both *supra;* but cf. *Consumer-Farmer Milk Cooperative, Inc., supra,* and *Automobile Club of St. Paul,* 12 T.C. 1152 (1949).[3]

It has been recognized by the courts that the providing of low-cost housing and low-cost farming (to those in need of them) can constitute the promotion of social welfare within the meaning of the section, *Scofield* v. *Rio Farms, Inc.,* and *Garden Homes Co.* v. *Commissioner,* both *supra,* even though exemption has been denied in some cases because it was found that the taxpayer was organized to make some profit. *Industrial Addition Association,* 1 T.C. 378 (1942), affirmed per curiam 149 F. 2d 294 (C.A. 6, 1945) ; *Amalgamated Housing Corporation,* 37 B.T.A. 817 (1938), affirmed per curiam 108 F. 2d 1010 (C.A. 2, 1940). It is not necessary for exemption that the recipients of the social welfare promotion be paupers. *Scofield* v. *Rio Farms, Inc., supra.*

Petitioner argues that in acquiring Lake Forest, a low-rent public housing project, and operating it according to PHA policy and requirements, it was providing low-rent housing to its tenant-purchaser members, giving them an opportunity to acquire their own homes at low cost, and that this activity constitutes the promotion of social welfare. Petitioner, in its reply brief, argues as follows:

Petitioner submits that providing low-rent housing for its members and others is the promotion of social welfare * * *. If this were not true, how could the Congress of the United States justify the millions of dollars that have been spent in the financing and construction of low-rent housing projects? Is the provision of this type housing for the promotion of social welfare when supplied by the federal government but not when supplied by a non-profit cooperative housing corporation?

[3] Language in these last two above-cited cases would suggest that the net earnings of a civic league must be "devoted exclusively to charitable, educational, or recreational purposes." However, the statutory construction to the contrary as set forth in *Hanover Imp. Soc.* v. *Gagne,* 92 F. 2d 888 (C.A. 1, 1937), followed in *United States* v. *Pickwick Electric Membership Corp.,* 158 F. 2d 272 (C.A. 6, 1946), seems manifestly sound and has been followed in the income tax regulations; sec. 29.101(8)–1, Regs. 111; sec. 39.101(8)–1, Regs. 118; sec. 1.501(c)(4)–1(b), Income Tax Regs.

Respondent argues that this was not the promotion of social welfare because the Government and not the petitioner built the housing units, and accordingly that petitioner did nothing to alleviate the alleged housing shortage. This argument is not convincing; the operation and maintenance of a low-rent housing project on a nonprofit basis may alleviate a housing shortage, because such a shortage may otherwise exist for those who are unable to afford higher priced homes. We do not understand the respondent to suggest that the Federal Government, after it built these projects, was not engaged in the promotion of social welfare in operating them.

Apparently, the Government considered these houses "surplus" in April 1947 and respondent argues that the 43 vacancies in 1949 and 1950 suggests the lack of any pressing housing shortage during the years in question. There is some merit to this argument. However, when petitioner discontinued what appears to have been an unsound policy of charging an incoming member the total equity acquired by the outgoing member, and charged instead only the usual downpayment, it no longer had any vacancies, and has had a waiting list since the year 1951, a fact indicative of the need for such housing among a group with very limited means. Further, while the Government chose to dispose of Lake Forest, the requirements it imposed indicate a continuing measure of concern on the part of the Government that the project be used in such manner as to promote its own housing project policies. In particular, it was required that petitioner operate on a nonprofit basis, grant priority to veterans, impose no unreasonable restrictions on membership, and grant the membership the opportunity to acquire these units as their own. PHA prescribed the low prices to be charged and according to the mutual ownership contracts a member was granted extended occupancy with postponement of his obligation to make his principal and operating payments when unable to make them currently because of illness or inability to find suitable employment. No provision was made for forgiveness of any payment. Finally, PHA kept close supervision and control over every aspect of petitioner's operation. These policies can hardly be explained as simply an effort by the Federal Government to protect its investment; they would seem to be evidence of a much broader and socially enlightened purpose. Be that as it may, these policies did, in fact, promote the social welfare of petitioner's membership.

Respondent's reliance on *Consumer-Farmer Milk Coop.* v. *Commissioner*, 186 F. 2d 68 (C.A. 2, 1950), affirming 13 T.C. 150 (1949), is misplaced. The Court of Appeals did say at page 71, that:

a consideration of the taxpayer's dominant and controlling purpose is necessary. If that purpose, as in the present case, is primarily to benefit the taxpayer's

membership economically, and only incidentally to further larger public welfare, then net income must be characterized as "profit" for purposes of section 101(8).

But in that case the activities resulting in economic benefit to the membership were purely commercial in nature, the marketing of milk products to the public, including so-called consumer members, at a price resulting in a reasonable margin of profit. There the taxpayer argued that the social benefits of more efficient milk distribution, particularly its beneficial effect upon low-income families, but nonetheless ordinary commerce with the public, and other activities, primarily educational, qualified it for exemption as a civic league. This Court found, as did the Court of Appeals in its affirming opinion, that social welfare was not the taxpayer's primary purpose. The language relied upon by respondent was not meant to set forth a rule that economic benefit to an organization's membership could never be the promotion of social welfare. Indeed, it is difficult to conceive of any effort more directly related to "social welfare" than economic betterment directed to a broad social class, especially when the particular form of economic betterment is firmly established as a public policy objective of the Federal Government.

Respondent further argues that petitioner is engaged in an activity primarily reserved to private enterprise, usually carried on for profit, and that he has ruled that in such instances, an organization cannot qualify for exemption pursuant to section 501(c)(4), even though its activities might promote social welfare. Rev. Rul. 58–517, 1958–2 C.B. 196. In that ruling, the taxpayer carried on business activities, the operation of bathing and fishing resort concessions, with the public at large that did, in fact, result in profit. None of the activities there engaged in could be said to be ordinarily not taxable, as is the purchase of one's home, which is the activity in which the membership of the instant petitioner is engaged. While it is true, as respondent contends, that the petitioner, as a corporation, was engaged in an activity which might have been carried on for profit, respondent has also ruled that such activity may be the basis for exemption. Rev. Rul. 55–439, *supra*. Further, respondent's argument fails to consider that many civic activities which are important in promoting social welfare might be carried on by a private business. In any event, this Court has not seen fit to adopt inflexibly the test suggested in the ruling. *Consumer-Farmer Milk Cooperative, Inc., supra* at 156.

Petitioner argues that it was not organized for profit. We are not certain that respondent directly argues to the contrary. However, inasmuch as he cites and discusses cases which turn on this question, *Consumer-Farmer Milk Cooperative, Inc., Industrial Addition As-*

*sociation*, and *Amalgamated Housing Corporation*, all *supra*, and our decision in *Garden Homes Co.*, 26 B.T.A. 441 (1932), it is necessary that we determine whether petitioner was "not organized for profit." In *Garden Homes Co.*, *supra*, we were not convinced that the so-called rental payments were not simply profit to the petitioner rather than in payment of the common stock as the Seventh Circuit found. In both *Industrial Addition Association* and *Amalgamated Housing Corporation*, profit, although limited in amount to 6 percent per annum, was paid to investors, in the former case on its outstanding certificates of beneficial ownership and in the latter case as dividends to preferred stockholders, and also to common stockholders who did not have to be tenants, although in fact they were. See I.T. 3411, 1940–2 C.B. 103. In the instant case, unlike the two cases above mentioned, the only equity investors in petitioner are its tenant members, the recipients of the social welfare in question. They cannot receive ordinary dividends. Further, there can be no profit making by private investors from whom the petitioners in *Industrial Addition Association* and *Amalgamated Housing Corporation* received their original capital. Instead, the Federal Government, acting through the PHA, except for the downpayment made by the membership, provided the loan capital necessary for petitioner's acquisition of Lake Forest. Finally, in the instant case, upon dissolution, assets must be distributed to the membership, the recipients of the social welfare, in accordance with their respective equities; the result is that the members buy their homes at actual cost.

We do not think that the phrase "not organized for profit" means that an organization cannot be exempt simply because it has income from its operations. It is more realistic to say that the income must arise from operations which result exclusively in social welfare and be devoted to that same purpose. As the Court of Appeals said in *Consumer-Farmer Milk Coop.* v. *Commissioner*, *supra* at 71:

The phrase "not organized for profit" is conjunctively linked with the phrase "but operated exclusively for the promotion of social welfare". The necessary implication is that the organization's net income must be considered "profit" within the prohibition of section 101(8) unless the income is devoted exclusively to promotion of social welfare. It is for this reason that a consideration of the taxpayer's dominant and controlling purpose is necessary. * * *

While certain language in some of our earlier opinions, *Amalgamated Housing Corporation* and *Garden Homes Co.*, both *supra*, might suggest that a corporation rendering social services to its membership could never qualify as an organization not organized for profit, we believe such language was not necessary to our holdings therein. Because a corporation is usually considered an entity separate from its stockholders, where a corporation promotes social welfare, as in this case, at a remuneration sufficient to cover operating

costs and establish necessary operating reserves, here required by the PHA, it does have income, even though it may not be organized for profit, for purposes of the exemption section.

Granted that operations of this general nature should be subject to careful scrutiny, the petitioner here has met every reasonable test. We hold that petitioner was a civic league or organization "not organized for profit but operated exclusively for the promotion of social welfare" and is exempt from tax pursuant to section 101(8) of the Internal Revenue Code of 1939 and section 501(c)(4) of the Internal Revenue Code of 1954.

Our holding as to the issue of exemption makes it unnecessary to consider the issues raised in the alternative.

Reviewed by the Court.

*Decisions will be entered for the petitioner.*

---

MURDOCK, *J.*, dissenting: I cannot agree that this was "social welfare" within the meaning of the Code. The investors might eventually own their own homes at a price less than cost to the petitioner and perhaps acquire an interest in certain accumulated profits. It is not true that this petitioner was "not organized for profit but operated exclusively for the promotion of social welfare." Cf. *Amalgamated Housing Corporation*, 37 B.T.A. 817, affirmed per curiam 108 F. 2d 1010 (C.A. 2).

TURNER and BRUCE, *JJ.*, agree with this dissent.

---

ATKINS, *J.*, dissenting: Section 501(c)(4) of the Internal Revenue Code of 1954 provides for the exemption of "Civic leagues or organizations not organized for profit but operated *exclusively* for the promotion of social welfare * * *." (Emphasis supplied.)

The petitioner was organized by World War II veterans and others to purchase certain surplus defense housing projects and to utilize the projects as homes for its members on a cooperative basis. Preference was given to veterans, but others might become members. Each member purchased a right to perpetual use of a dwelling in the project, making monthly payments to the petitioner to cover principal and interest payments and operating costs. The corporation acted gratuitously on behalf of its members only.

While the housing involved was low-cost housing and while it might be considered that in making these homes available to its members the petitioner was supplying some public need, it is my view that the petitioner was not operated *exclusively* for the promotion of social welfare within the intendment of the statute. In final analy-

sis, the petitioner was a mutual or cooperative housing corporation operating for the benefit of its members only. Such a corporation is not exempt from tax. While in the case of many, if not most, cooperative housing corporations the homes or apartments are not of low cost, this is not a sufficient ground for distinction. It is my opinion that the petitioner is not exempt from tax.

TURNER, KERN, BRUCE, PIERCE, and SCOTT, *JJ.*, agree with this dissent.